DAWKINS, J.
Miss Carrie Thompson was a passenger for hire upon one of the Tulane Belt cars of the defendant street railway, traveling from the place of her employment in the business district to her home in the Carrolton section of the city of New Orleans. When the car reached the New Basin canal, over which cars pass on a bridge of defendant in Carrolton avenue, the said bridge was open, and because of some trouble with its mechanism could not be promptly closed. The conductor on the car on which Miss Thompson was riding telephoned the barn, and was instructed to issue car to car transfers, and the cars on either side of the canal wex-e rerouted back over the respective-ends of the line until the bridge could be closed. The only means for cx’ossing the canal and reaching the cars on the other side for continuation of the passengers’ journey was the bridge of a steam railroad about a block and a half distant from that of defendant. The bxudge of the steam railroad consisted of a skeleton or trestle-like structure with a plank 12' inches wide running down the center, to be used by employés and not intended for pedestrians; in fact, there were large signs on either end warning against its use in such manner. However, both the conductor and supervisor of defendant, who was present, suggested and invited its use by the many lxundi’eds of passengei’s who had arrived on either side of the canal, and, as above stated, transfers were given to be used by the passengers, including Miss Thompson, when the canal had been so crossed.
The bridge of the steam railroad was also open when the passengers began to arrive, and it was some minutes before it was closed. In the meantime, a crowd estimated by the witnesses at several hundreds, had accumulated. The bridge tender refused to close until he heard the signal of an approaching fast freight train, which, according to schedule, passed every day about 6:30 p. nf. However, as soon as the closing was made, the crowd began to press forward, and Miss Thompson, among the first to stai’t across (one or two *701 having preceded her and others starting from the other side), had gone only a short distance on the bridge when the train came in view from around a curve, moving slowly., Confusion immediately ensued, and one of the witnesses says that he took a stand at the end of the bridge and attempted to prevent any one else from starting over, but that by this time Miss Thompson had, as stated, progressed some distance upon the bridge. Soon the alarm was given that some one had fallen overboard. The train passed on, and in a few minutes thereafter Miss Thompson was fished out of the canal by a city patrolman and others. Life was not entirely extinct, but she could not be revived, and expired a little while afterwards. None of the witnesses saw her fall.
This suit was brought by a brother and two sisters of the deceased against the street railway company for damages. Another sister did not join in the action, and subsequently one of the two who did died leaving the other and the brother as plaintiffs.
Defendant denied the charges of negligence made against it, and pleaded contributory negligence on the part of deceased. There was a trial by jury, a verdict for defendant, and from a judgment in conformity thérewith plaintiffs appeal.
Opinion.
The contention of the plaintiffs is that defendant undertook to carry Miss Thompson safely to her destination, and that this included a safe method of crossing the canal when the means ordinarily used had failed; that she had a right to rely upon the superior knowledge of defendant and its agents, who suggested the use of the railroad bridge, and to assume that it was reasonably safe; that as a matter of fact it was not safe to the knowledge of defendant, and that by suggesting its use, as was done, without warning, at a time when it knew that a train was due, and would likely produce the condition of panic among its passengers which followed, was an act of gross negligence, rendering it liable for the death of plaintiffs’ said sister.
Defendant replies that the situation was so obviously dangerous that it was an act of contributory negligence on the part of deceased to have used the bridge, notwithstanding its (defendant’s) invitation to do so. And defendant’s counsel likens the circumstances of this case to one in which it might havse been suggested that the deceased swim across or walk across the canal on a tight rope, which, if accepted, considering her mature age (28) and judgment, would have produced no liability on its part because of the obvious danger.
However, the record does not show that Miss Thompson knew of the train’s schedule which would likely bring it upon the scene at that particular time; nor does it appear that she had any knowledge of its approach until the alarm was given when the headlight came within view around the curve. The track was so constructed that the train came directly from the rear of those who were attempting to cross, and its course only changed when it reached a point near the bridge, and hence the rays of the headlight did not fall upon the path of deceased until it was so near that its presence was naturally calculated to frighten and confuse any one upon the bridge. In view of the late hour, 6:30 p. m., the crowded condition of the street cars, and the constantly increasing number of persons wishing to cross and continue their journeys, it was but natural that their attention would be riveted upon the process of crossing and' reaching home; especially in view of the fact that it was rapidly becoming dark, and that section of the city was not very inviting to one left at that hour.
[1, 2] At' least one person and probably more had preceded the deceased across the *703 bridge, and others were coining from the other side; and, in view of all the circumstances, we do not think it was contributory negligence on her part to attempt to avail herself of this means of continuing her journey, which defendant had suggested and invited. On the other hand, we do think that it was highly negligent on ,the part of defendant to so direct her, without suggestion or warning of the fact that a train was likely to arrive momentarily, and without providing some means of flagging and preventing it from running down the passengers who might be on the bridge. The condition which developed and produced the deceased’s confusion and doubtless caused her to fall had a result but naturally to be expected; and the failure to warn and safeguard her was the proximate cause of her death. Hence the defendant is liable. Clerc v. M. L. & T. R. R. & S. S. Co., 107 La. 370, 31 South. 886, 90 Am. St. Rep. 319; Le Blanc v. Sweet, 107 La. 355, 31 South. 766, 90 Am. St. Rep. 303.
[3, 4] It is but recently that the law has been so amended as to allow brothers and sisters to recover in a case such as this. The amount of the recovery must necessarily be gauged by the intimacy of the relation, association, and feeling of the plaintiffs toward the deceased. Here, the deceased lived in the house with the plaintiff brother, and the other plaintiff was a sister residing in another part of the state, whom she visited three or four times a year, principally during her vacation from work as an employé of a department store in the city of New Orleans. However, their relations were close and cordial, and we have every reason to assume that the sister’s tragic death caused them severe nervous shock and mental suffering which should be compensated as far as money can do so. Considering all features, we think a judgment of $1,000 a piece in favor of the plaintiffs would be just and reasonable.
For the reasons assigned the judgment of the lower court is annulled and reversed, and it is now ordered, adjudged, and decreed that there be judgment in favor of plaintiffs in the sum of $1,000 each, with legal interest from judicial demand, and that defendant pay all costs.