HARDY, Judge.
This suit was instituted for the recovery of damages by the eight surviving brothers and sisters of one Clyde H. Dodge who was killed in an automobile accident in Natchitoches Parish on July 8, 1954. The defendants, Foremost Dairies, Incorporated, its employee and driver of the truck involved in the accident, James Davis, and its insurer, United States Casualty Company, have admitted liability, and the only issue which has been concerned in this case . involved the fixing of the quantum of damages. The decedent was a resident of the State of California and plaintiffs are residents of the states of California, Arizona and Oregon. The record is made up of depositions of the plaintiffs in answer to written interrogatories, copies of decedent’s bank statements, and a copy of the succession proceedings with relation to decedent’s estate. On this testimony and exhibits the matter was submitted to the district court, which rendered judgment in favor of plaintiffs totaling the sum of $31,990.91, from which judgment defendants have appealed. Plaintiffs have answered the appeal, seeking an increase in the amounts awarded to each.
There is no dispute as to the sum of $990.91 representing funeral expenses, which amount was apportioned among the eight plaintiffs. Eliminating this item from consideration, the judgment awarded one sister of decedent, Mrs. Rhoda Dodge Freeman, the sum of $10,000, and each of the other plaintiffs, brothers and sisters of decedent, the sum of $3,000. It is evident from the record and judgment that a uniform allowance of $3,000 was made to each of the plaintiffs in the nature of damages caused by mental anguish, pain and suffering resulting from the news of the tragic death of their brother and deprivation of his companionship, love and affection. The additional sum of $7,000 awarded to Mrs. Freeman, over and above the uniform allowance made to each of the other plaintiffs, unquestionably is the measure of damages fixed by the district judge for her loss of material benefits and substantial contributions to her support and maintenance by her deceased brother.
Defendants contend that the allowance of damages in the instant case is grossly excessive in view of the precedents established by our jurisprudence in similar cases. To the contrary plaintiffs assert that the awards are inadequate, particularly in view of the presently decreased purchasing power of the dollar.
In considering these opposed contentions we have carefully examined all cases in our jurisprudence instituted by *425 brothers and sisters of decedents for the recovery of damages in cases of death resulting from negligence. However, before attempting an analysis of these cases, we think it well to point out certain principles which we regard as being too well established to require citation of authority. In the instant case there is no element of damages resulting from the pain and suffering of the decedent, inasmuch as his death was instantaneous. We think the right of these plaintiffs to recover for items of mental pain, suffering, anguish and shock, and for loss of love, affection and fraternal association, is no longer open to question. Nor can there be any basis for disagreement on the frequently iterated pronouncement that losses of this kind are not susceptible of exact measure in determination of monetary awards.
Counsel for defendants contend that the judge of the lower court erred in the award made in favor of Mrs. Rhoda Freeman because she was not entitled to recover anything upon the basis of allegedly uncertain and insufficiently proven contributions to her maintenance and support, which, at most, were mere gratuities. In support of this position counsel cite Eichorn v. New Orleans & C. R. Light & Power Co., 114 La. 712, 38 So. 526; Dowell, Inc., v. Jowers, 5 Cir., 166 F.2d 214, 2 A.L. R.2d 442, and Bourg v. Brownell-Drews Lbr. Co., 120 La. 1009, 45 So. 972. Conced-edly counsel rely, by analogy, upon the application of the cited cases, which are authority for the rule that a child is not entitled to recover for loss of contributions by a parent after reaching the age of 21 years, Eichorn v. New Orleans & C. R. Light & Power Co., and Dowell v. Jowers, both cited supra, nor a parent entitled to recover for loss of contributions by a major son until the parent, as a foundation for such recovery, has established a legal right to support because of need. Bourg v. Brownell-Drews, supra. Counsel argue that the cited'cases:
“ * * * clearly indicate that unless the survivors have some legal right to support from the decedent, they have no right to recover loss of contributions in an action for wrongful death. There is no provision in Louisiana law whereby a sister could claim the right of support from her brother.”
While we agree with the legal principle set forth in the above cited cases, we cannot accord with the conclusion drawn and the sweeping, general application contended by learned counsel. We think counsel failed to make the obvious distinction between loss resulting from the recognition or enforcement of a legal obligation and an equally material and compensable loss resulting from the voluntary assumption and discharge of a natural obligation. To conclude that the loss of support or contribution to support of a wholly or partially dependent sister by a brother is not an element of damages resulting from the wrongful death of the brother because our law does not require such support, would be to lend approval to a code of conduct more commensurate with an animal existence than with the dignity of human relations. We are not here concerned with the legally enforceable obligations which flow from statutory provisions, but with the actual pecuniary and material loss which has been sustained as a natural consequence of a tortious act. In our opinion there is no reasonable support for the contention that this particular plaintiff is barred from the recovery of damages resulting from the loss of material benefits, in the nature of contributions to support and maintenance, of which she has been deprived by the wrongful death of her brother.
Inasmuch as we have embarked upon a consideration of the claim of the plaintiff, Mrs. Rhoda Dodge Freeman, we think it advisable to proceed with a discussion of the appropriate facts which form the basis for our conclusion as to the award in her favor.
At the time of death Clyde H. Dodge was fifty-three years of age, and had a life expectancy of 18.79 years; the plaintiff, Mrs. Rhoda Dodge Freeman, was sixty-two years of age, with a life expectancy of 12.86 years. The relationship between *426 this sister and her brother appears, from the uncontroverted testimony in the record, to have been exceptionally close, affectionate and mutually helpful. Early in the year 1951 it was determined that Mrs. Freeman’s husband was affected with cancer of the throat, and, upon learning this distressing news, Mrs. Freeman immediately communicated with and turned for assistance and comfort to her brother, Clyde, who immediately proceeded to San Francisco, and removed his sister and her sick husband to his own home in Temple City, where he cared for them until Mr. Freeman’s death in the year 1952. After her husband’s death, Mrs. Freeman continued to make her home with her brother, where she was made most welcome and comfortable. The evidence shows that Clyde Dodge’s home, which he owned equally with an unmarried friend, one Thomas Shannon, who was killed in the same accident in which Clyde Dodge lost his life, was above the average in comfort, convenience and attractiveness, which factors were emphasized by a number of the witnesses. According to the uncontradicted testimony of Mrs. Freeman her brother established his own bank account as a joint account upon which she drew for her personal needs and comforts as well as for the maintenance "of the household. Additionally, Mrs. Freeman testified that on not infrequent occasions her brother would give her amounts in cash for vacation trips or for other purposes. Aside from the support of her brother Mrs. Ftee-man’s only established income was derived from a World War I veteran’s- widow’s pension which at the time of trial amounted to $50.40 per month. The picture of the close and affectionate relationship between this sister and her brother is unmarred by any implication of discord or difficulty of any kind, and implicit in the record before us is ample substantiation for the conclusion that the sister was dependent for the continuance of a pleasant, comfortable life upon the material support, as well as the intangible elements of love and affection, which were bestowed by her brother.
It is clear from the record that Mrs. Freeman is and has been for some years incapable of self support. She has no training, no experience which would fit her for work, and her age, of course, militates against the probability of securing remunerative work. Additionally, it is established that Mrs Freeman suffered serious injuries, resulting from an automobile accident, which would, in our opinion, be more than sufficient to physically disable her from undertaking any gainful occupation.
The deterioration in her living conditions as well as in the very nature and enjoyment of life which have occurred with respect to this plaintiff are graphically reflected by her own testimony. As administrator of the estate of her deceased brother Mrs. Freeman effected a sale of his interest in his home, and, upon delivery to the purchaser some five months after his death, she was forced to seek another domicile, which she found in a house trailer located in a trailer park in Jacumba, California. The change from a full and pleasant life in a comfortable home, which, it is testified, contained three bedrooms, two baths, living room, dining room, kitchen and a yard that appears to have been somewhat notable for a profusion of flowers, the raising of which provided a special interest for her brother, to the cramped and obviously unattractive circumstances of life in a trailer; the transition from a life of ease in which the necessities of food, shelter and clothing, as well as incidental conveniences, enjoyments and small luxuries were supplied, to dependence upon a pension allowance of $50.40 per month, which, at best, will provide in this day and time for very limited needs; the loss of a close companion, and the attendant evidences of love and affection, these are very real elements of damage which make dreary and empty the remaining years of her life. Cognizant of the fact that this loss cannot be adequately compensated in money, we are, nonetheless, constrained to the conclusion that the award made by the lower court, under the circumstances, is somewhat inadequate and should be increased to a sum more commensurate with the actual measure of the damage sustained.
*427 Proceeding to a consideration of the awards made in favor of the seven remaining plaintiffs, which are based exclusively upon claims for loss of companionship, love and affection, and upon the suffering and mental anguish caused by the shock of their brother’s death, we have carefully considered the somewhat limited number of cases to be found in the jurisprudence of this state dealing with awards in favor of brothers and sisters, which cases we quote as follows: Underwood v. Gulf Refining Co., 128 La. 968, 55 So. 641; Thompson v. New Orleans Ry. & Light Co., 148 La. 698, 87 So. 716; Langenstein v. Rey-naud, 13 La.App. 272, 127 So. 764; Quaid v. Heymann, La.App., 150 So. 867; Hebert v. City of New Orleans, La.App., 163 So. 425; Chustz v. Negrotto, La.App., 165 So. 479; Pegg v. Toye Bros. Yellow Cab Co., La.App., 167 So. 896; Warnick v. Louisiana Highway Commission, La.App., 4 So.2d 607; and Cox v. Gross, La.App., 47 So.2d 102.
We briefly analyze what we regard as the relevant details of the opinions in the cases above cited, considering them in order as follows:
In the Underwood case [128 La. 968, 55 So. 652], decided by the Supreme Court in 1911, the opinion comments on the classification of recoverable damages as those resulting “from moral as well as material injury, from injury to feelings as well as to purse.” With reference to the relation between plaintiffs and their deceased brother the court made the following comment:
“The decedent was about 27 years of age at the time of the accident, and left neither wife nor child nor parent, and no brother or sister, other than plaintiffs, one of whom was of the same age (being a twin) and the other a few years younger. Neither of the plaintiffs was dependent on the decedent, nor had they seen much of him for several years prior to his death, though their relations were brotherly and affectionate, and the decedent had rendered some assistance to the younger brother in the completion of his education.”
Of the three justices concurring in the majority opinion in the above cited case,it appears that Mr. Justice Provosty, the author of the opinion, and Mr. Justice Land, though being of the opinion that “something more substantial might reasonably be allowed,” deferred to the opinion of Mr. Chief Justice Breaux that purely nominal damages, for mental suffering by plaintiffs should be allowed, and fixed the amount of the award in response to this item at $50 each, having already allowed $1,000 each by reason of the physical suffering of the decedent prior to death.
In the Thompson case [148 La. 698, 87 So. 718], decided by the Supreme Court in 1921, the following pertinent observation is quoted from the opinion:
“It is but recently that the law has been so amended as to allow brothers and sisters to recover in a case such as this. The amount of the recovery must necessarily be gauged' by the intimacy of the relation, association, and feeling of the plaintiffs toward the deceased. Here, the deceased lived in the house with the plaintiff brother, and the other plaintiff was a sister residing in another part of the state, whom she visited three or four times a year, principal^' during her vacation from work as an employe of a department store in the city of New Orleans. However, their relations were close and cordial, and -yve have every reason to assume that the sister’s tragic death caused them severe nervous shock and mental suffering which should be compensated as far as money can do so. Considering all features, we think a judgment of $1,000 a piece in favor of the plaintiffs would be just and reasonable.”
In the Langenstein case [13 La.App. 272, 127 So. 766], tried by the Orleans Court of Appeal in 1930, the court allowed $2,000 each to the plaintiffs in addition to funeral and medical expenses of the. décedent (who *428 had a life expectancy of ten years) and summarized its reasons on this point as follows:
“As to the quantum of damages it appears that the deceased was 63 years of age, was in good health, and lived with his two sisters, who are the plaintiffs in this case, for a number of years; , that they received support from him and that he assisted in operating the small dairy until about six months before the time of his death, at which time the cows were not giving any milk and for that reason the dairy was temporarily closed. They testified that he was contributing $50 per month to their support. They further testified that he was a kind and loving brother who looked after and protected them.”
In the Quaid case [150 So. 868] decided by the Orleans Court in 1933, after fixing damages for pain and suffering of decedent prior to his death, the court made the following observation relevant to its consideration of the item of damages concerning loss of companionship, affection and support:
“In regard to the second item of damage claimed, which concerns itself with the loss of companionship, affection, and support, the record indicates that the deceased was employed as a checker at the American Sugar Refinery, earning about $100 per month; that of this amount he paid into a common fund administered by his sisters the sum of $30 per month, deceased and his four sisters forming part of one household, and his brother, Charles A. Quaid, being married and residing elsewhere with his family. The deceased was 59 years of age and his brother and sisters were each of them older than he was. Their precise ages .do not appear. Every member of the household was employed except Miss Mary Quaid, the blind sister, who, after having been a school teacher for 40 years, was retired on a pension of $48.75 per month. Miss Kate and Miss Margaret Quaid were also school teachers and employed in the public schools at a salary of $156 and $179 a month, respectively. Miss Nano L. Quaid worked in the public library at a salary of $90 a month. Each of the sisters had accumulated considerable savings, which had been invested in homestead stock, which, due to prevailing conditions, has greatly depreciated in value.
“The picture we get of the household excites our admiration: Four sisters and a brother, one of them blind, spending the evening of life together, all of them usefully employed, not excepting the blind sister, who, after a teaching career of 40 years, has retired and now devotes herself to the management of the household; a thrifty, intelligent, kindly group, mutually sustaining and helpful. The removal of the brother from this household was, we believe, a distinct and serious loss to the survivors, but, with the exception of the blind sister, we are not impressed with the claim for dependency. On the second item of damages claimed we will allow Mary Quaid $1,500, Kate Quaid, Nano L. Quaid, and Margaret Quaid, $1,000 each, and Charles A. Quaid, $250.”
The Hebert case [163 So. 427], decided by the Orleans Court in 1935, involved an action by a plaintiff for damages resulting from the death of her 63 year old sister. The court allowed $1,000 for the loss of companionship and observed:
“The record shows that the deceased had lived in New Orleans for approximately fifteen years and that plaintiff lived, so far as we can ascertain, in one of the country parishes. The sisters visited each other usually two or three times during the year. There seems to have been no dependency of either on the other, except that plaintiff contributed slightly to the support of her deceased sister.”
In the Chustz case, decided by the Orleans Court in 1936, the court allowed *429 $1,500 each to a brother and sister, in addition to funeral expenses, for loss of companionship, love and affection. The court noted that the relationship between the 19 year old decedent and her brother and sister was “quite normal”, and further commented on the fact that there was no claim of dependency on the part of plaintiffs nor of any contributions to their support by their deceased sister.
In 1936 the Orleans Court decided the Pegg case, and made an allowance of $1,000 for loss of love, companionship, affection and for the pro-rata portion of the inherited claim for decedent’s suffering. However, in connection with the latter item, the court noted that the decedent, though lingering for five days after injury before death, was unconscious during the entire time, though giving evidence of periods of intermittent, acute suffering.
In the Warnick case [4 So.2d 613], decided by the First Circuit Court of Appeal in 1941, the court affirmed an award of $1,000.00 each to surviving brothers and sister of decedent without detailed comment, except for the observation that the decedent was held in “great esteem and affection by his brothers and sister.”
In the Cox case [47 So.2d 105], which was decided by the First Circuit in 1950, the court made an award of $125 each to the plaintiffs, the two sisters of decedent, but the reasons for such an apparently insubstantial allowance we believe to be adequately explained in the following factual analysis set forth in the opinion:
“As to the quantum of damages, it is shown that the two plaintiffs, Mrs. F. M. Moore, who was a resident of Hammond, Louisiana, and Mrs. Katie Cox, who lived in Clinton, Louisiana, were 73 and 78 years of age, respectively. It is shown that although Mrs. Cox lived in Clinton her brother did not stay with her and apparently she did not see him very often. He had at one time stayed at her house but there is some testimony to the effect that her son had caused him to leave. Regardless of the truth or not of this testimony, it is apparent that she and her brother were not very close nor did she take any great interest in the deceased and his affairs. It is also shown that Mrs. Moore, who lived in Hammond, did not see her brother often nor carry on any regular correspondence with him. There was no deep attachment shown and certainly very little companionship between the deceased and his two sisters.”
In the instant case we are called upon to perform the thankless and virtually impossible task of computing the value of imponderables such as love, affection and companionship in the mundane and materialistic terms of dollars and cents. This charges us with the obligation of attempting to resolve into a mathematical equation a number of unknown factors, vague, indefinite and infinite in their existence, extent and evaluation. In this pursuit, on the basis of the authorities above cited, we are compelled to take into account all differences in the circumstances and conditions of relationships between each of the plaintiffs and the decedent, and to measure the degrees of the warmth of the existing relationships and the love and affection between the respective plaintiffs and the decedent.
In performance of the unenviable task before us, it appears to be necessary to make some comment, in brief résumé, of the relationship between the decedent and each of plaintiffs.
Three of plaintiffs, John, Alva and Annie, were half-brother and half-sisters and, additionally, first cousins, of decedent. The five remaining plaintiffs were full brothers and sisters of decedent. This unusual relationship was due to the fact that decedent’s mother was first married to his father’s older brother, of which union the three children, John, Alva and Annie, were the result. Following the death of her first husband the widow married his younger brother and of this union were born the five remaining plaintiffs. At the *430 time of the death of Clyde H. Dodge the respective ages of plaintiffs were as follows :
Alva Dodge Lucas 69 years
John E. Dodge 67 years
Ann Dodge Williams 65 years
Rhoda Dodge Freeman 62 years
Blanche Dodge Boyle 60 years
Thomas H. Dodge 55 years
Ralph S. Dodge 51 years
Reese E. Dodge 49 years
Decedent entered the service of the United States Navy, when he was 16 years of age, during World War I, and remained in service for several years. He entered and served in the Merchant Marine during World War II. The somewhat sketchy biographical narratives of decedent’s life, as given in the depositions of plaintiffs, indicates that he was inclined to travel from place to place and from job to job without incurring fixed responsibilities or obligations and without feeling either the inclination or the need to sustain any one kind of employment over a long period of time, despite which it appears he succeeded in earning a better than average living, and accumulated sufficient money and property to satisfy his needs. The succession proceedings filed in the record disclose the fact that decedent’s net estate, distributed among his brothers and sisters as heirs, amounted to something in excess of $8,000. Testimony in the record justifies the conclusion that decedent enjoyed a comfortable living, at all times, to such an extent that, as above noted, he was able to care for his sister, Mrs. Freeman, and, indeed to give assistance to other members of the family as occasion required. On the occasion of the accident which caused his death Clyde Dodge was making an. extended vacation trip with his companion, Thomas Shannon, in an automobile and trailer unit, and the course of the journey had taken the vacationers from California to Louisiana, from which it was contemplated they would proceed to the east coast before returning to California.
Alva Dodge Lucas lived in Mesa,.Arizona, some 400 miles from decedent’s home in Temple City, California, and she had the opportunity of visiting or being visited by her brother, Clyde, not more than two or three times a year.
John E. Dodge lived at Lehi Valley, Arizona, some four to five hundred miles removed from Temple City, California, and he testified that he had seen very little of his brother, Clyde, during their lives and had been with him only twice in the course of the preceding four years.
Ann Dodge Williams testified, mistakenly, we believe, that she saw Clyde “off and on all the time, every week or more often than that.” In view of the fact that Ann lived at Mesa, Arizona, and, considering the testimony of the other witnesses, particularly that of Mrs. Freeman, we are convinced that Mrs. Williams was inadvertently in error and it appears more likely that she had the opportunity of seeing her half brother, Clyde, only two or three times a year.
Blanche Dodge Boyle lived at Lehi, near Mesa, Arizona, and while her contacts with her brother had been frequent over a period of time they had become more rare since her removal to Arizona about six years prior to his death, during which period she saw him not more than a few times a year.
Ralph S. Dodge lived in Grant’s Park, Oregon, some 800 miles from Temple City, California, and testified that he and his brother visited about twice a year.
Reese E. Dodge lived in Norwalk, California, about 25 miles from Temple City, and had the opportunity to visit with his brother, Clyde, once or twice a month.
Thomas H. Dodge lived in Baldwin Park, California, only seven or eight miles from Temple City, and had more frequent contact with his brother than any of the other plaintiffs, with the exception of Mrs. Freeman.
While the frequency or infrequency of contacts between relatives is, at best, an unstable basis for fixing the value of companionship, it must be considered as one *431 of the factors and, in the instant case, probably the most reliable indication of the closeness of the existing relationship. This is not to say that the love and affection, existing between brothers or sisters who are deprived of the opportunity of being with one another at frequent intervals, is any the less than those who are more fortunately situated, but, in our opinion, it does substantially affect the sense of loss and the resultant measure of damages caused by the untimely removal of one by the hand of death.
As has been many times observed, the fixing of damages based upon loss of companionship, and upon deprivation of the evidence of love and affection, is, perforce, an arbitrary determination. And we concede, as urged by counsel for plaintiffs, that, ordinarily, in this respect the finding of the trial judge is entitled to be accorded even more than the usual high degree of consideration. However, in the instant case, the trial judge was in no better position, nor did he have any greater advantage, than the members of this court, inasmuch as none of the witnesses appeared in person and the record is made up of testimony by deposition, together with documentary exhibits. We draw the inference, from the briefs and arguments ' of counsel, that the trial judge did not feel justified in making any distinction between the measure of damages as between the several plaintiffs and this, of course, is evident from the judgment itself in which equal awards were made to all parties with the exception of Mrs. Freeman, who was the only one claiming, and entitled to, an allowance for support. In some of the cases above cited our courts have pointed out the differences in the nature of the existing relationships as justification for distinctions in the amounts awarded, with which reasoning we are in accord. The difference in ages, in association, the opportunities for personal companionship, all are elements of consideration.
In the instant case we are further impelled to give some attention to the decrease in the purchasing power and consequent value of the dollar, and further to the ability of the defendant to respond in damages. These have become almost routine matters for attention of courts in arriving at the quantum of damages in any case, and it follows that precedents are to be evaluated in the light of these circumstances with respect to a determination of their weight and influence.
In view of all these considerations, and for the reasons which we have set forth, deeply sensible of the fact that the necessary arbitrary nature of such an action will neither please nor satisfy any of the parties litigant, and even more aware of our own dissatisfaction with such a necessity, we have concluded that the judgment appealed from should be amended and recast in order to effect what we regard as indicated changes in the amount of the awards, with the exception, of course, of the pro-rated allowance made to each of the plaintiffs for reimbursement of funeral expenses.
Accordingly, it is ordered, adjudged and decreed that the judgment appealed from be and it is hereby amended and recast to read as follows:
It is ordered, adjudged and decreed that there be judgment in favor of the plaintiffs, hereinafter named, and against the defendants, United States Casualty Company, Foremost Dairies, Incorporated, and James Davis, in solido, in the amounts hereinafter set forth, with interest thereon at the rate of 5% per annum from date of judicial demand until paid, together with all costs, to-wit:
Mrs. Rhoda Dodge Freeman $12,621.23
Mrs. Alva Dodge Lucas 1,624.24
Mrs. Annie M. Dodge Williams 1,624.24
John E. Dodge 1,124.24
Mrs. Blanche Dodge Boyle 1,624.24
Thomas H. Dodge 3,124.24
Ralph Seth Dodge 1,624.24
Reese E. Dodge 2,124.24
As amended and recast the judgment appealed from is affirmed.