123 So.2d 625 (1960)
Peggy Morgan PENNINGTON, Ind., etc., Plaintiff-Appellee,
v.
JUSTISS-MEARS OIL COMPANY, Inc., et al., Defendants-Appellants.
No. 5059.
Court of Appeal of Louisiana, First Circuit.
September 15, 1960.
Rehearing Denied November 2, 1960.
Certiorari Granted January 9, 1961.
*627 Breazeale, Sachse & Wilson, Baton Rouge, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, Kantrow, Spaht, West & Kleinpeter, Baton Rouge, Gaharan & Richey, Jena, for appellants.
Benton & Moseley, Kizer, Heaton, Craig & Cangelosi, Baton Rouge, for appellee.
Before TATE, MILLER and PUTNAM, JJ.
TATE, Judge.
This is a wrongful death action in which the trial court awarded the plaintiff, the *628 widow of Claude Pennington, Jr., a total of $219,743.45 for the damages sustained by her and her three minor children as a result of Pennington's death. The defendants, the Justiss-Mears Oil Company, Inc. and its liability insurer, appeal; and the plaintiff answers the appeal requesting that the award be increased.
On August 16, 1957, the decedent was struck and killed by the end of a 94-foot stand of drilling pipe which fell out of the side of an open-faced drilling rig being operated by the above-named defendant corporation (hereinafter referred to as "the defendant"). The pipe had escaped from the control of the defendant's employees who were in the process of drilling an oil well. This test well was what is called a "slim hole operation", using 2 7/8-inch drill-pipe, which the evidence reveals to be more flexible and limber that the larger (e.g., 3½" or 4½" or larger) drill pipe more often used in normal drilling operations. The difficulty of controlling this more flexible drill pipe was increased, in the operation in question, by the circumstance that the defendant was using it in three-joint lengths (or "stands"), rather than in shorter stands or which a shorter drilling rig, since due to the length of each stand and the comparative thinness of the drill-pipe each stand was quite limber and had a pronounced bow or bend in its mid-portion when handled vertically.
The plaintiff's chief contentions of negligence are: (a) that the defendant was negligent in failing to have the open-faced derrick equipped with a guard (a "bellyband" or cable or rope) around its mid-section in order to permit greater control of this slender and flexible pipe and to prevent it from falling from the open side of the drilling derrick; and (b) that the defendant's employees negligently lost control of the drilling pipe which fell and killed young Pennington and/or negligently caused it to fall.
We adopt our learned trial brother's summary of the facts and his conclusions as to liability as follows:
"The derrick had one open side, except for a small platform called a monkey board, which enclosed the open side near the top. There were slots, called fingers, arranged inside this board, and when the pipe was pulled out of the well by the elevator the deck-hand on the ground floor guided the bottom end of the pipe to the spot where the pipe was set for stacking. When the bottom end was so placed, the man on the monkey board released the elevator at the top and pulled [manually and with a loose rope he wrapped around the pipe] the top end of the pipe to be slotted into the fingers. At this well the derrick was high enough to enable the driller to pull three joints of pipe out of the well at one time. For that reason this particular derrick was called a `thrible' (triple) decker.
"On the occasion in question on August 16, 1957, about the first time to come out of the hole the string of three joints of pipe pulled out measured altogether 94.8 feet long. The monkey board was about 89 feet above the ground floor where the bottom end of the pipe rested. The slim pipe was flexible, and the man on the monkey board had trouble getting the top end pulled into the fingers for racking. The pipe bowed into the closed side of the derrick. When the top and was pulled toward the fingers the bow in the pipe came toward the open side of the derrick and `fouled' behind a pin which held the upright sections of the derrick in place. The deckhand at the ground floor noted the trouble and used a 24-inch pipe wrench to turn the pipe away from the pin. When he did that, the bow in the pipe came out of the derrick through the open side to the extent that the top end of the pipe went under the monkey board and the pipe fell to the ground.
"Claude B. Pennington, Jr., was at the well site talking to employees of * * * [a chemical analysis unit employed by his *629 father, Dr. Pennington, which maintained a laboratory in a small steel hut at the drilling site about 40 feet north of the drilling rig.] When the alarm was given that the pipe was falling young Pennington attempted to run to safety and had almost cleared the distance to be out of reach of the pipe, but the top end struck him on the head, causing almost instant death. Mr. Pennington was engaged in the oil business to some extent with his father and also as an independent lease broker on his account. He had no financial interest in that drilling project. * * *
"* * * If it be true that 94.8 feet of 2 7/8-inch pipe will not bend of its own weight a sufficient amount to lower the top end some five feet, or enough to come under the monkey board, then it seems reasonable that when the man on the ground floor turned the pipe to let it pass the pin against which the pipe had caught about the middle of the derrick, the pipe then continued to bend outward through the open side of the derrick with sufficient momentum to extend the bend beyond its normal bow. It was gross negligence of the deck man to risk causing the pipe to come out of the derrick, which the pipe was trying to do when it hit the pin. If by lack of experience with slim pipe this man did not expect that pipe to do that, then it was gross negligence to employ such a man in that position. This man should have known slim pipe potentialities. The driller testified that his crew had never used pipe of 2 7/8-inch diameter before.
"To my mind, the most glaring element of gross negligence in this case is demonstrated by the absence of the belly-board, or some type of guard at the middle of the derrick and on the open side. Any sort of strong material would doa cable, a rope, a pipe or iron bar. Some witnesses explained that one could be made on the site. Mr. Randall, the driller [for defendant], testified that [prior to the accident] they discussed installing a belly-board on that job * * * Tr. 149, 150. [See also Tr. 139-141] He had never drilled with 2 7/8-inch pipe pulled out of the well in `thribles' (three joints at a time). They [the defendant's employees] installed one [a "belly band"] almost immediately after the accident. The company officials and some defense witnesses said that they had never seen a pipe fall out of the derrick. * * *
"The testimony of plaintiff's rebuttal witnesses, Mr. Hoffman, Mr. Cornell and Mr. Bush, beginning at page 840 of the transcript is too positive, definite and convincing to ignore. * * * They are all experienced, independent operators and two of them came up all the way from roughneck to owners and operators of drilling rigs in their own rights. In short, they say they have seen all kinds of pipe fall out of derricks and they would not consider the use of slim pipe of the kind used by this defendant without a belly and or board on the derrick.
"Therefore, I find and hold that the contention of the defense in this case, that this defendant drilling company in drilling this oil well was not obligated to take precautions against something they say could not have been anticipated or that experienced men could have no reason to expect this to happen and that such a pipe had never been known to fall out of a derrick before, is not supported by a preponderance of the evidence. * * *"

I.
In urging reversal, the defendants-appellants principally contend that under all foreseeable circumstances it was a physical impossibility for the drill-pipe, 94.8' in length, to have bowed or bent sufficiently so as to escape from under the monkey-board (the lower edge of which was about 88' above the drilling platform upon which the bottom of the pipe rested) and to fall out of the drilling rig and injure a bystander. Therefore, it is urged, the defendant's employees were not negligent in failing to have some type of a guard, such as a "bellyband", around the mid-portion of the derrick *630 to prevent the drill-pipe from escaping and, also it is argued, that the defendant's employee was not negligent in so twisting the pipe as to cause it to escape from under the monkey-board.
The appellants additionally contend that the decedent assumed the risk and/or was contributorily negligent by being in such close proximity to the hazardous operation of drilling an oil well. And they finally contend, alternatively, that the judgment should be reversed and the case remanded to receive certain evidence tendered to prove that the handling of 2 7/8" drill-pipe was not essentially different from or more hazardous than the use of other types of drill-pipe and that the procedures used in the present case were in accord with the standard safety practices of the oil industry.
The appellants rely heavily upon the expert testimony of an eminent physicist, based upon his mathematically exact calculations, that various (95', 94', 93', 92', 91') lengths of 2 7/8" drill-pipe would not bend or bow "of its own weight" (Tr. 761, 765) and "without the intervention of a third force" (Tr. 764, see 765, 766) sufficiently so as to fall below the floor of a monkey-board about 88 feet above the ground. (For instance, a 94' length of pipe would have a 10.23' deflection from the straight at its maximum bow, but its top end would still be 4.2' above the floor of a monkey-board 87' 7" above the ground level, according to these calculations.) The substance of the defendant's contention that it was unforeseeable that a top end of a stand of pipe such as that in question could slip under the floor of the monkey-board and fall out of the drilling rig is the physicist's testimony that it is not possible for a stand of pipe situated at the point of maximum bow, with the end of the pipe sticking up "as much as 2 or 3 feet" over the monkey-board, "by its own weight for that pipe to go down lower when you [e. g., a roustabout on the monkey-board] bring that pipe towards the vertical" (Tr. 767), which the roustabout up on the monkey-board is normally trying to do when pipe is being removed from the well-hole, in order to manuever the stand of drill-pipe out of the drilling-derrick body and into a slot on the monkey-board outside of the derrick structure.
The self-limiting nature of this testimony is evident. The question is not whether the pipe could bend of its own weight sufficiently so as to slip below the bottom of the monkey-board. The question is, rather, whether there is a foreseeable risk that it will do so in the normal course of drilling operations, when other forces are being applied against the pipe, such as the efforts of the roustabout on the monkey-board at the top end of the pipe and of the roustabout on the floor of the drilling rig at the bottom end of the pipe, as they endeavor to maneuver the stand of drill-pipe into position in a slot on the monkey-board.
As to this question, experts testifying on behalf of the plaintiff testified on the basis of their personal observations and experience that, without a guard or "belly band" to aid in controlling and holding in the pipe, there is a real and foreseeable risk that 2 7/8 pipe used in three-length stands, being very limber, will escape from the control of the oil-workers and thus escape from the rig as the roustabouts wrestle to maneuver a stand into position. This is somewhat corroborated by the admission of the defendant's driller that it was customary to use some such kind of a guard when slimmer pipe such as 2 7/8 drill-pipe was used (Tr. 139-141, Tr. 149-151) and by the uncontradicted fact that time immediately following the present accident a belly-band was installed on defendant's drilling rig to make it easier to handle the pipe.
We do not believe that the trial court erred in accepting this testimony supporting the plaintiff's position over the contradictory expert testimony introduced by the appellants.
Assuming, as the appellants contend, that the sole cause of the accident was the action of the defendant's ground roustabout *631 in turning with a pipe wrench the bowed stand of drill-pipe as its mid-portion was caught behind a pin on the derrick-structure, we think that such act on the part of the defendant's employee was itself negligent. Even without the scientific explanation in the record (Tr. 790-795), it is quite apparent that when the roustabout on the floor turned the stand of pipe with his wrench, this application of force caused the limber pipe's mid-portion to bend and pulled the top of the pipe out of the hands of the other roustabout up on the monkey-board. It also caused the top portion of the pipe above the pin to bend at a sharper angle, so that the top end of the pipe slipped downward below the floor of the monkey-board andwithout anything else to hold it from fallingfell outward and killed the decedent. Under the circumstances, the fall of the pipe from the well-derrick, obviously endangering those in the vicinity, was a foreseeable consequence of the imprudent twisting application of force through the pipe wrenth by the defendant's employee, whether or not any of the defendant's witnesses had ever seen drill-pipe fall from derricks before.
With regard to the decedent's alleged contributory negligence in running away from the falling pipe rather than jumping into a nearby mud-pit, it is well settled that any misjudgment in reacting to a sudden emergency caused through the defendant's negligence does not bar recovery but is, rather, deemed to be a consequence of the defendant's initial negligence. See e. g., Higginbotham v. Frazier, La.App. 1 Cir., 92 So.2d 89, certiorari denied.
And, insofar as the decedent is alleged to have assumed any risk of the accident by being in the vicinity of the drilling operation, the evidence reveals that he was at the scene of the accident in the interest of the lease-holder, his father (Tr. 251-253, Tr. 97), for whom the defendant as an independent contractor was drilling the test well. The decedent was thus not a trespasser entitled only (as some cases hold, cf., Platt v. Bender, La.App. 2 Cir., 178 So. 678) to protection against wanton injury, but he had in fact as much right to be on the premises as the defendant's employees, and he was owed by them the duty of reasonable care under the circumstances. The decedent was not required to foresee and did not assume any risk that the defendant's employees would so negligently handle the drilling-pipe as to lose control of it and endanger him and the employees of the chemical-analysis unit stationed at the drilling-site and any other bystanders, whose presence in the vicinity was reasonably to be expected, Cf., e. g., Jackson v. Young, La.App. 1 Cir., 99 So.2d 400.

II.
The defendant sought to introduce evidence of the customary practices of the defendant company and of the oil industry in general, which testimony it was alleged would prove (a) that use of 2 7/8 drill-pipe is not essentially more dangerous than that of other types of drill-pipe and (b) that belly-bands are not safety devices nor recommended to be used "as such" but rather that "a belly-band has always been regarded as a piece of equipment to lighten the work of the derrick men and to assist in keeping the pipe straight when it is put in the rack" (Tr. 659). (As to this last point, (b), concerning the alleged purpose of belly-bands, the trial court in fact permitted such evidence to be introduced. See e.g., Tr. 127, Tr. 727, Tr. 743-746.)
The trial court sustained objections to evidence as to custom or usage pertaining to other types of pipe than that used herein, with this explanation in its reasons for judgment:
"Upon objection, this general line of testimony was not allowed, particularly as to drilling with any other size and type of pipe other than the 2 7/8-inch pipe used in this operation, but the defendants were not limited in such proof in regard to drilling operations and customary methods employing the same type of pipe and other equipment *632 as used at this well. This court held that whatever may be the custom and accepted practice of drilling oil wells with other size and types of pipe and equipment had no bearing upon what might be demanded of a driller with slim pipe, * * * Under this ruling the defense then adduced evidence and projected motion pictures to explain drilling operations. Some of their testimony was to the effect that no other precautions than this driller employed at this rig were needed or required. Expert testimony was given that 2 7/8-inch pipe 94.8 feet long would not bend of its own weight to the extent that the top and would be lowered enough to come under the monkey board as the pipe did at this well on this occasion."
With due respect to our learned trial brother, it appears that in a few instances during the course of the protracted trial from time to time objections were sustained to opinion evidence that related to the customary precautions or expectations connected with the use of 2 7/8 drill-pipe. See, e. g., Tr. 673, 676, 730, 731-734. Although testimony reflecting the personal experience or observations of the witnesses in connection with the use of 2 7/8 drill-pipe was admitted, the court did sustain objections to some opinion testimony concerning such use on the ground that the evidence sought was "some opinion which the Court must draw from the testimony and I don't propose that he would usurp the province of the court" (Tr. 736).
We think, however, that counsel for the plaintiff made it plain repeatedly that he did not intend to object to anything relating to the use of 2 7/8 drill-pipe in the triple-joints (see, e. g., Tr. 747, 848-850), and the trial court before the close of the trial plainly stated that "The only limitation I put on the defense in going forward with the proof was pertaining to [other types of pipes or closed derricks, etc.] than 2 7/8" drill-pipe," Tr. 924, further again repeating that it had specifically excepted from its ruling which sustained the general objection as to customary practices "the uses and practices as to 2 7/8-inch pipe", Tr. 959. See also Tr. 847-848, 926-929.
The applicable legal principles are not disputed. "By the great weight of modern American authority a custom [defined as "a fairly well defined and regular usage * * * among a group of people such as a trade, calling or profession"] either to take or to omit a precaution is generally admissible as bearing on what is proper conduct under the circumstances, but is not conclusive. Such evidence, coupled with testimony that the custom was observed, may be offered to show due care. Or non-conformity to custom may be used to show negligence." 2 Harper & James, The Law of Torts (1956), Section 17.3, pp. 977-978. "Custom and usage may be regarded as a matter proper for consideration in determining whether or not sufficient care has been exercised in a particular case, but it is not conclusive or controlling, for the customary way of doing a thing may be a negligent way and may create a false standard of care, and, once negligence is established, such negligence cannot be justified by custom," Harris Drilling Co. v. Delafield, 222 La. 416, 62 So.2d 627, 629-630. See also Cassanova v. Paramount-Richards Theatres, Inc., 204 La. 813, 16 So.2d 444, 447-448.
Under all the circumstances of the record, including that the trial court did in fact admit evidence offered by the defendant to prove that the use of a guard or belly-band was not a standard safety precaution in the use of 2 7/8" drilling-pipe and that before the close of the trial its ruling was fully explained, we do not think that the defendant was deprived of an opportunity to present substantial relevant testimony.
But there is in the record a tender of proof dictated by the defendant's counsel, setting forth the conclusions to be drawn from evidence they wished to offer and which may have been in part erroneously *633 excluded. Tr. 656-662. Even considering that these witnesses would have so testified, the view most favorable to defendants, such testimony would not relieve the defendants of negligence in this case and our conclusion in this regard is unchanged.

III.
The District Court rendered judgment in favor of the decedent's widow, Mrs. Pennington, individually, in the sum of $150,000 for loss of maintenance and support, $10,000 for loss of love and companionship, and $1,243.45 for funeral expenses, making a total award to her individually of $161,243.45. It was this court's conclusion after reviewing the evidence that "her husband would contribute to her maintenance and support the sum of $10,000.00 per year for thirty years". This annual support, when discounted at five per cent per annum in order to arrive at its present cash worth, totalled $153,724.66. The Trial Court awarded $150,000 for this item, as stated.
With respect to the minor children the court was of the opinion that the loss of support to each child was $1,000 per year during minority, and by discounting this amount at five per cent annually, reached an award for loss of support at $12,000 for Darryl, age 2, $11,500 for C. B. Pennington, III, age 3, and $11,000 for Paula, age 4. The Court also awarded $8,000 for each minor child for loss of love, companionship and affection.
In the answer to the appeal it is contended by able counsel for the plaintiff that the Trial Court erred in the following respects:
"1) In holding that plaintiff in her individual capactiy was not entitled to recover anything for the reasonable expectation of inheritance from her husband.
"2) In holding that the minor children were entitled to receive only the sum of $1,000 per year discounted at five per cent during minority for loss of support.
"3) In failing to make any allowance whatsoever to the minor children for their loss of reasonably anticipated inheritance * * *"
The appellants on the other hand, contend that the award to the widow for loss of support is excessive. The substance of their contentions in this regard is that the District Court (a) erred in finding that the decedent's average net annual income for the five years preceding the accident was $21,000, (b) erred in using such figures as a basis for projecting future expected income since allegedly the decedent's cash proceeds mostly resulted from a single lucky oil strike, and (c) erred in computing the widow's loss of support as one-half of such amount in the absence of any proof that this share of his earnings was actually spent for her support.
The facts show that the decedent was aged 35 at the time of the accident, with a life expectancy of 40 years, and that his wife was then aged 25, with a life expectancy of 54.55 years. They had been happily married for nearly 5 years and had three small children. At the time of his death, and at the time of the trial, the average monthly royalty checks from producing interests he had acquired was in excess of $2,000 (which amount, subsequent to his death was being received by his children).
The decedent had acquired an estate with a gross valuation, for federal estate tax purposes, of $280,679.48 and a net valuation, after deducting debts and mortgages, of $153,161.08. Included in this estate tax return at nominal valuation were 1/48th overriding mineral royalty interests in 37,000-odd acres of land spread over various areas, representing the results of plaintiff's leasing efforts for 3½ years prior to his death, during which time, according to substantially uncontradicted testimony, he took an overriding royalty interest as his commission rather than a cash commission *634 of $2.50 per acre. These acquisitions were in addition to his net cash income for the 5 years preceding his death, which latter averaged over $21,000 annually. We note, but are not impressed by the defendants' argument that we should not consider these acquisitions because the decedent did not declare any income for federal or state income tax purposes as a result of such acquisitions. We also note that the Certified Public Accountant testifying on behalf of the plaintiff testified that for tax purposes such acquisitions were not income attributable to the year in which the work was done.
The decedent was the only son of a very successful oilman. As the District Court concluded: "Counsel [for defendants] further contend that whatever success the decedent enjoyed resulted not from his own earnings but from gifts and other assistance from his father, and therefore, his earning ability cannot be given consideration in appraising plaintiff's loss. I do not share this view. In my thought, and I do not accept it as true because the evidence is overwhelming to the contrary, such source would not have the effect to diminish the claims for compensation [by his widow and children for loss of support] in this case. Neither do I assume that if Mr. Pennington had lived his earnings or income would be cut off by the depletion in the Lobdell Field [which was the main source of the decedent's royalty income]. While it is common knowledge that the oil business is extremely hazardous from a financial standpoint, it is also reasonable to assume that Mr. Pennington would not have become idle and that greater opportunities should develop."
It is to be pointed out, also, that the acquisition of overriding mineral royalty interests in nearly 40,000 acres in widespread fields in which exploration for oil was to be undertaken represented a calculated investment in the enriching possibility of future production, or of the probability of being able to re-sell these royalty interests when drilling commenced in the vicinity at a figure substantially higher than the cash commission value of $2.50 per acre, in lieu of which these overriding mineral interests had been taken. They also tangibly represent an earning capacity in the oil leasing industry which could, in case of need, be translated into cash commissions rather than the investment of efforts in mineral royalty interests. We therefore do not find persuasive the appellants' contention that the decedent's business expenses exceeded (omitting the decedent's large royalty income) his business income over the five years prior to his death, for the results of the decedent's efforts were largely invested in overriding mineral royalty interests.
Likewise, in measuring the widow's claim for loss of support, we do not find to be especially relevant the circumstances that, by a pre-marital contract entered into between the decedent and his wife, all his earnings and acquisitions remained his separate property. Although as a result of this agreement the wife did not have a community interest in these earnings, nevertheless she had a right to expect to receive substantial support over the years from her relatively wealthy husband, even though the source was from his separate rather than from their community funds. As stated by our brothers of the Second Circuit in allowing a recovery for loss of support by a dependent sister for the loss of her brother, "we are not here concerned with the legally enforceable obligations which flow from statutory provisions, but with the actual pecuniary and material loss which has been sustained as a natural consequence of a tortious act," Freeman v. United States Casualty Co., La.App. 2 Cir., 88 So.2d 423, 425, certiorari denied.
Our Supreme Court recently stated: "The monetary damages resulting from loss of support cannot be calculated with mathematical exactitude. They are speculative in nature and as in the case of damages for loss of love and companionship, mental anguish and other damages of that character, much discretion must be left to *635 the judge or jury", Brown v. S. A. Bourg & Sons, Inc., 239 La. 473, 118 So.2d 891, at page 895, citing Civil Code Article 1934 LSA. As we ourselves noted in Duree v. State, La.App. 1 Cir., 96 So.2d 854, 865: "* * * the function of this appellate court is not to set out a rigid formula into which like `Univac', can be fed all the infinitely variable and immeasurable factors affecting the award of the damages to the decedent's wife and infant daughter through loss of his earnings, to arrive at the precise and immutable answer as to the present worth thereof. It is rather, against the contentions of the State that the award was excessive and of the appellee that it was inadequate, to ascertain whether, under the pleadings and facts of this particular case, the District Court abused its discretion by its award."[1]
Taking into consideration all of the factors above-notedincluding the life expectancies of the spouses, the decedent's high cash income as a successful oil man over their marital life and the likelihood that such would continue and even increase, their very happy marriage bound by the ties of three children and the likelihood that their marriage would continue, the unlikelihood that any subsequent marriage by the surviving spouse (if any indeed occurred) would be as financially successful, the constantly decreasing purchasing power of the dollar over the years, the circumstance that the decedent was the only son of a wealthy and successful oil producer and associated with him in various enterpriseswe cannot say that the trial court erred or abused its discretion in allowing the widow a recovery for the loss of her reasonably to be expected support based upon an annual valuation of support at $10,000 per year over 30 years, discounted to present cash value. Brown v. S. A. Bourg & Sons, Inc., 239 La. 473, 118 So.2d 891; Fontenot v. National Transfer Co., La.App. 1 Cir., 99 So.2d 795, certiorari denied; Duree v. State, La.App. 1 Cir., 96 So.2d 854, certiorari denied as to quantum; Marler v. State, La.App. 2 Cir., 78 So.2d 26, certiorari denied.
The appellants do not complain that the other amounts awarded to the widow and children are excessive, if recovery is to be allowed.
With regard to the answer to the appeal requesting an increase in the award for the reasons quoted in the opening paragraphs of this section (III) of this opinion, we likewise do not find that the trial court committed manifest error or abused its discretion in making and denying the awards in question.
Although by pre-marital contract the widow had waived any community interest in the decedent's acquisitions, it is urged that an award should nevertheless be made to her for loss of inheritance upon the ground that she might have received a share of the decedent's estate by will or as her marital portion under Civil Code Article 2382-LSA[2]. We agree with the trial court that such an award would be speculative under the circumstances of this case, *636 where in fact no will was actually made by the husband in favor of the wife and where so many contingencies would have to occur to entitle her to a marital portion greater than that which (if any) she was entitled to receive at the death of her husband in 1957, and where (as to be stated below in discussing the children's claim) it is speculative to assume that in fact the decedent's estate would have appreciably increased.
Insofar as the children's claim for loss of inheritance is concerned, under all the circumstances of this case, we do not find that the trial court erred in failing to make such an additional award. They did in fact receive a substantial inheritance from their father, but composed in substantial part of depletable oil properties. While it is not speculative to assume that they and their mother would have continued to receive a substantial amount of support as a result of their father's high income from his oil activities, it can be considered speculative to assume that the decedent's acquisitions of oil properties would have produced an accretion to his estate at a rate substantially in excess of the living expenses of this high-income family and of the rate of depletion of his other oil properties, so that a disallowance by the trial court of recovery by the children for such alleged loss of inheritance was not erroneous, nor an abuse of its discretion.
For the reasons above-stated, we do not find it necessary to pass upon the contention of the appellants that a recovery for loss of inheritance is not allowable under the law of Louisiana, nor (for that matter) upon the contention of the appellee that such damages are properly allowable.
Likewise, we do not find to be manifestly insufficient the trial court's allowance to each child of $1,000 per year during minority for loss of support. See, e. g., Andrus v. White, La.App. 1 Cir., 101 So.2d 7 (certiorari denied as to this item of recovery, see 236 La. 28, 106 So.2d 705). It is to be noted that the three children inherited from their father a total royalty income totalling about $2,000 per month, which factor the trial court undoubtedly took into consideration in making its award. The amounts awarded for loss of love and companionship are not manifestly insufficient under the jurisprudence above-cited.

Decree
For the foregoing reasons, the judgment of the trial court is
Affirmed.
NOTES
[1] This portion of our ruling was approved by the Supreme Court in denying certiorari therein, although a writ of review was granted but restricted solely to the availability of a tort recovery against the State, see 238 La. 166, 114 So.2d 594.
[2] Art. 2382. "When the wife has not brought any dowry, or when what she brought as a dowry is inconsiderable with respect to the condition of the husband, if either the husband or the wife die rich, leaving the survivor in necessitous circumstances, the latter has a right to take out of the succession of the deceased what is called the marital portion; that is, the fourth of the succession in full property, if there be no children, and the same portion, in usufruct only, when there are but three or a smaller number of children; and if there be more than three children, the surviving, whether husband or wife, shall receive only a child's share in usufruct, and he is bound to include in this portion what has been left to him as a legacy by the husband or wife, who died first. * * *"