106 So.2d 348 (1958)
Mrs. Estelle Maddox DEASON, Individually and as Natural Tutrix of Her Minor Children, Peggy Joyce Deason et al., Plaintiffs-Appellees,
v.
The GREYHOUND CORPORATION et al., Defendants-Appellants.
No. 4648.
Court of Appeal of Louisiana, First Circuit.
October 8, 1958.
Rehearing Denied November 21, 1958.
*349 Borron, Owen, Borron, & Delahaye, Baton Rouge, Stafford & Pitts, Alexandria, for appellants.
Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for appellees.
ELLIS, Judge.
On the morning of July 14, 1955, Marcus C. Deason boarded the Greyhound bus on the outskirts of Centerville, Mississippi and paid a cash fare to Baton Rouge, Louisiana, and at that time told the driver that he was en route to his home in Oakdale, Louisiana, and requested that the driver stop the bus when he met the Trailways bus on the outskirts of Baton Rouge, so that he could board the bus and continue his journey to his home in Oakdale. It was shown that Deason's wife had previously made a trip to visit him in Centerville, Mississippi and upon her return had learned that the Greyhound bus arrived in Baton Rouge too late to make connections with the Trailways bus, and so notified her husband to make such a request. Just after the Greyhound bus went under the overpass, which is on the Airline Highway, its driver, James W. Pouns, one of the defendants herein, saw the Trailways bus approximately 400 feet south at the traffic light in the intersection of West Mason and Scenic Highway. Thereupon, he gave an adopted signal which consisted of flashing of the lights on his bus to the Trailways driver which signified to the bus driver of Trailways that he had a passenger who wished to board the Trailways bus. The driver of the Trailways bus acknowledged the signal and began slowing down in order to stop and pick up the passenger. The Greyhound bus was stopped on the Scenic Highway next to the right hand or west curb thereof, and Deason got off with his suitcase through the front right hand door and to the front of the bus and started across Scenic Highway in order to board the Trailways bus on the opposite side thereof. This highway has four lanes which are each ten feet wide, with a neutral ground six feet wide in the center. When Deason reached a point estimated by the witnesses as being six to eight feet west of the neutral ground he was struck by the truck belonging to the defendant Porter Kent and being driven by the defendant Rudolph Knight. Deason died on May 26, 1956, from the serious injuries which he received on July 14, 1955.
The present suit was filed by his widow and children against the Greyhound Corporation, James W. Pouns, the driver of the Greyhound bus, Continental Southern Lines, Inc., hereinafter referred to as Trailways, Sherman Frank, driver of the Trailways bus, Porter Kent, owner of the truck which struck the deceased, Marcus C. Deason, Rudolph Knight, driver of the Kent truck, and the Canal Insurance Company, insurer of the Kent truck.
Plaintiffs alleged in their petition that the defendants were guilty of the following negligence and we quote:
"35. Plaintiff alleges that the accident and the resulting injuries to and death of Marcus C. Deason and damages and expenses were due to the combined and concurrent negligence of James W. Pouns, Sherman Franks, and Rudolph Knight; the combined negligence of each is set forth hereinafter.
"36. James W. Pouns, the driver of the Greyhound bus, was guilty of concurrent negligence proximately causing the accident and the resulting injuries, death, damages and expenses in the commission or omission of the following acts, all of which were and are imputable to his employer, defendant, The Greyhound Corporation:
*350 "(a) In failing to see that Marcus C. Deason was safely transferred from the Greyhound bus to the Trailways bus;
"(b) In stopping the Greyhound bus for the transfer of Marcus C. Deason in the middle of a block and particularly in the west lane of south bound traffic on Scenic Highway, in violation of the ordinance of the City of Baton Rouge, Louisiana, when he knew or should have known that parking the bus in such a position was prohibited because the front of his bus was parked within a few feet of a posted sign reading `No Parking on Pavement.';
"(c) In failing to discharge Marcus C. Deason for the transfer approximately sixty yards south of the location selected for the transfer when he knew or should have known that at the intersection of Scenic Highway and Mason Street there was a traffic control signal light where the transfer could have been made in safety;
"(d) In signaling the Trailways bus to stop in the middle of the block;
"(e) In parking the Greyhound bus in such a position with reference to the Trailways bus as to extend an implied invitation to Marcus C. Deason to cross Scenic Highway in front of the Greyhound bus in safety, and in both impliedly and expressly advising and inviting Marcus C. Deason to cross immediately in front of the Greyhound bus;
"(f) In failing to warn Marcus C. Deason of the danger from overtaking southbound traffic when he knew or should have known of such danger inherent in the position selected to make the transfer;
"(g) In failing to keep a proper lookout for overtaking southbound traffic from the vantage point of height in the Greyhound bus and to warn Marcus C. Deason of any traffic approaching when he knew or should have known that the position of Marcus C. Deason to observe overtaking traffic was an unfavorable one due to the height and width of the bus and its obstruction of the highway and he knew or should known that Marcus C. Deason was depending and had a right to depend upon both bus drivers to see that he was safely transferred from one bus to the other;
"(h) In the event he saw the approaching truck in failing to warn Marcus C. Deason of the vehicle approaching from the rear of the bus and toward the path to be taken by Marcus C. Deason in making the transfer from the Greyhound bus to the Trailways bus;
"(i) In failing to give signals to overtaking vehicles of the transfer being made across Scenic Highway so as to permit the transfer to be made in safety;
"(j) In being otherwise guilty of negligence proximately causing and contributing to said accident, particularly, in failing to take the necessary precautions to see that when Marcus C. Deason accepted the advice and invitation to make the transfer from the Greyhound bus to the Trailways bus across Scenic Highway he could do so in safety.
"37. Sherman Franks, the driver of the Trailways bus, was guilty of concurrent negligence proximately causing the accident and the resulting injuries, death, damages, and expenses, in the commission or omission of the following acts, all of which were and are imputable to his employer, defendant, Continental Southern Lines, Inc.;
"(a) In stopping the Trailways bus in the middle of the block to make the transfer of the passenger to the Trailways bus from the Greyhound bus;
"(b) In failing to stop the Trailways bus at the intersection of Scenic Highway and Mason Street upon receiving the signal from the Greyhound bus driver that a transfer was to be made when he knew or should have known that traffic at the intersection of Scenic Highway and Mason Street was controlled by a signal light *351 and the transfer could have been made there in safety;
"(c) In stopping the Trailways bus in the east lane of the two northbound traffic lanes of Scenic Highway in violation of the provisions of the City Ordinances of the City of Baton Rouge, Louisiana;
"(d) In stopping the Trailways bus in such a position as to grant an implied invitation to Marcus C. Deason to cross Scenic Highway to the front of the Greyhound bus when he knew or should have known that crossing Scenic Highway from the front of the Greyhound bus to the Trailways bus was subject to certain inherent dangers unless proper precautions were taken to maintain a proper lookout for the safety of Marcus C. Deason who would have an unfavorable vantage point to see overtaking traffic on Scenic Highway following the course or path selected for the transfer, and when he knew or should have known that the Greyhound driver would both impliedly and expressly advise and invite Marcus C. Deason to cross immediately in front of the Greyhound bus;
"(e) In the event he could not for some reason make the transfer at the intersection of Scenic Highway and Mason Street he should have stopped his bus so that the front of the Trailways bus was to the rear of the Greyhound bus and the path or course of the transfer would have been to the rear of the Greyhound bus rather than to the front of the Greyhound bus and thus there would not have been an invitation to Marcus C. Deason to cross to the front of the Greyhound bus in order to make the transfer;
"(f) In failing to warn Marcus C. Deason of the approach of overtaking traffic from the rear of the Greyhound bus when he was in a position easily to ascertain said danger and he knew or should have known that Marcus C. Deason was in an unfavorable vantage point to see overtaking and approaching traffic because of the position of the Greyhound bus which was parked in violation of the ordinances of the City of Baton Rouge, Louisiana, and which because of its height and width obstructed the view of Marcus C. Deason, and when he knew or should have known that Marcus C. Deason was depending and had a right to depend upon both bus drivers to see that he was safely transferred from one bus to the other;
"(g) In attempting to make the transfer at all at the location and under the conditions prevailing and in the manner chosen for the transfer;
"(h) In failing to choose a location for the safe loading of a passenger;
"(i) In being otherwise guilty of negligence causing and contributing to said accident, particularly, in failing to take the necessary precautions to see that when Marcus C. Deason accepted the expressed and implied invitation to make the transfer from the Greyhound bus to the Trailways bus across Scenic Highway he could do so in safety.
"38. Rudolph Knight, the driver of the truck, was guilty of concurrent negligence proximately causing the accident and the resulting injuries, death, damages and expenses, in the commission or omission of the following acts, all of which were and are imputed and imputable to his employer at the time of the accident, defendant, Porter Kent:
"(a) Rudolph Knight failed to keep a proper lookout for pedestrians crossing Scenic Highway particularly when he knew or should have known of the likelihood of such pedestrians crossing the highway in view of the parked Greyhound bus in the west lane of southbound traffic and the parked Trailways bus in the east lane of northbound traffic;
"(b) Rudolph Knight was operating the truck he was driving at too fast a rate of speed under the circumstances, particularly, in view of the fact that he knew or should have known of the possibility of the discharge of passengers from one bus *352 to the other in view of the parked positions of the two busses;
"(c) Rudolph Knight failed to have the truck which he was operating under proper control;
"(d) Rudolph Knight overtook and passed a stopped bus in violation of the provisions of the ordinances of the City of Baton Rouge and the Parish of East Baton Rouge, Louisiana;
"(e) Rudolph Knight was otherwise guilty of negligence, carelessness, and reckless driving under the circumstances, all of which was negligence proximately causing and contributing to the accident.
"39. The acts of negligence complained of herein on the part of James W. Pouns, Sherman Franks, and Rudolph Knight were each concurrent and contributing acts of negligence which proximately caused the injuries, death, damages and expenses sued on herein.
"40. On information and belief petitioner alleges that in the act of transferring a paying passenger from one bus to another, each bus driver acted as the agent and servant and employee of both The Greyhound Corporation and Continental Southern Lines, Inc., and each and all of the acts of negligence of each and both said bus drivers were and are imputable to and imputed to both The Greyhound Corporation and Continental Southern Lines, Inc.
"41. Plaintiff further alleges that defendant, The Greyhound Corporation and Continental Southern Lines, Inc., are liable, in solido with all other defendants, for the damages sustained by Marcus C. Deason while he was a fare-paying passenger and all damages due to his death, as heretofore stated, because defendants did not safely transport him to his destination, which defendants had contracted to do.
"42. Plaintiff alleges that the mere happening of the accident while her husband was a fare-paying passenger being transferred from the Greyhound bus to the Trailways bus creates one or more inferences that said defendants, the Greyhound Corporation and Continental Southern Lines, Inc., and each and both of them failed to fulfill their contract of safe carriage, and said defendants, The Greyhound Corporation and Continental Southern Lines, Inc., are liable to plaintiff in solido with all other defendants, because of the said inference or inferences of the failure of said The Greyhound Corporation and Continental Southern Lines, Inc., to fulfill their contract of safe carriage, unless said defendants exculpate themselves from liability by a preponderance of the evidence and show affirmatively that they fulfilled their contract of safe carriage with Marcus C. Deason."
To the petition defendants Continental Southern Lines, Inc., and Sherman Franks, The Greyhound Corporation and James W. Pouns filed exceptions of no cause of action and no right of action. The exception filed by Trailways and Franks was based upon the contention that plaintiff's petition affirmatively showed by its allegations that Deason was not a passenger on their bus at the time of his injuries, which he received when struck by the Porter Kent truck. Further that the petition failed to show any breach of duty or obligation by it or its driver due to Deason, nor did the petition show that they were guilty of any negligence which caused or contributed to the accident. They contended under their exceptions that the allegations of plaintiff's petition showed that the proximate cause of the accident was the conduct of Deason himself in attempting to cross the highway from a place in front of the Greyhound bus without knowing that he could make the crossing in safety, and, in the alternative, they contended that the petition of the plaintiff affirmatively alleged facts which showed that Marcus Deason was guilty of contributory negligence which was the proximate cause of the accident.
*353 The above exceptions were referred to the merits by the late Judge Charles A. Holcombe. Answers were filed by the defendants which contained an alternative plea of contributory negligence on the part of the deceased, Marcus C. Deason. The case was duly tried and judgment rendered in favor of the plaintiff and against the defendants, The Greyhound Corporation and James W. Pouns, and Continental Southern Lines, Inc., and Sherman Franks, in solido. Judgment was further rendered overruling the exception of no cause of action previously filed and referred to the merits on behalf of Continental Southern Lines, Inc., and Sherman Franks, and the exception of no cause of action and no right of action previously filed and referred to the merits on behalf of The Greyhound Corporation and James W. Pouns. Judgment was rendered in favor of the defendants, Porter Kent, Rudolph Knight and Canal Insurance Company rejecting the demands of all plaintiffs and dismissing their suit against the named defendants.
Motions for rehearing and new trial were filed on behalf of the defendants cast and were overruled by the court. An appeal suspensive and devolutive, was granted to defendants cast in judgment to this court. An answer to the appeals was filed on behalf of the plaintiff in which they pray that the principal sum awarded to plaintiffs be increased and in the alternative that the judgment of the District Court be affirmed.
Counsel for Trailways and its driver strenuously re-urged his exception of no cause of action filed herein and overruled after a consideration of the merits of the case. We find, after a careful consideration of the entire record, that the allegations of fact contained in plaintiff's petition, as distinguished from conclusions of the pleader, were not enlarged by the testimony presented on the trial of the merits, and, therefore, we believe it to the best interest of all parties concerned that a decision upon the merits, rather than upon the exception only, be rendered herein. For these reasons the judgment of the lower court in overruling the exceptions of no cause of action filed on behalf of Trailways and its driver is sustained, without any prejudice whatsoever to a consideration and final decision on the merits of the case from the entire record.
Although the record in the case is somewhat lengthy, the facts proven on the trial are, in the main, undisputed, other than as they apply to the plea of contributory negligence made by the defendant as a bar to recovery by the plaintiff. The testimony on the latter point will be discussed in detail when we consider the plea of contributory negligence. A short résumé of the substantial and material facts necessary for an understanding of the contentions of plaintiffs and of the defendants are in order at this time.
The record reveals that decedent, Marcus C. Deason, had been employed in Centerville, Mississippi, and on July 14, 1955, desired to visit his home in Oakdale, Louisiana. In order to do this it was necessary that he ride the Greyhound bus to Baton Rouge and there transfer to a Trailways bus which would take him to Alexandria, La., and then another transfer which would take him to his home in Oakdale, Louisiana. He was aware of the fact that the Greyhound bus reached Baton Rouge after the Trailways bus had left there, but that the two buses passed on the outskirts of Baton Rouge on the Scenic Highway before the Trailways bus turned from the latter highway to go on the Airline Highway and over the over-pass and the Mississippi River bridge and thence to Alexandria, Louisiana. Therefore, he boarded the Greyhound bus in the morning on the outskirts of Centerville, Mississippi and paid his fare to the defendant Pouns, who was the operator of the Greyhound bus, and at that time requested the latter to notify the driver of the Trailways bus that he had a passenger who wished to transfer, and, therefore, to stop the Greyhound bus and allow him to get off in order *354 that he might get on the Trailways bus and continue his journey toward his home in Oakdale, Louisiana. As the Greyhound bus passed under the over-pass the driver saw the Trailways bus, either at the light or leaving the light, at the intersection of West Mason and Scenic Highway, a distance of some 400 feet. He proceeded but at a slower rate in order that he might come to a stop, and gave the signal which consisted of the flashing of lights which was the usual customary, pre-arranged signal between bus drivers to notify the approaching bus that a passenger wished to get off and transfer to the other bus. The Trailways bus driver, Sherman Franks, acknowledged the signal and slowed down in preparation for a complete stop off of the highway in order that Deason might cross Scenic Highway and board the Trailways bus. Of course, Deason had no ticket or had paid no fare on the Trailways bus but intended to pay cash when he boarded the bus. The Greyhound bus was stopped some 140 or 150 feet north of the intersection of West Mason and Scenic Highway against the curb in the west lane for southbound traffic in order that Deason might alight from the Greyhound bus. At this time the Trailways bus was proceeding in the east lane for northbound traffic across Scenic Highway and was still to the front of the Greyhound bus, which gave the driver and any occupants of the Trailways bus who might be observing or looking a clear view of what happened thereafter.
Deason got out at the right front door of the Greyhound bus and stepped directly upon the grass between the sidewalk and the west curbing of Scenic Highway. He walked to the front of the bus and started across Scenic Highway toward the Trailways bus which, at this time, was still moving slowly toward a parking place completely off of the highway, and which when completed placed the Trailways bus to the rear but on the opposite side of the street from where the Greyhound bus had stopped to allow Deason to alight. Scenic Highway at the point of the accident and fatal injury to Deason is a four lane, busy traffic artery. Each lane is ten feet in width, thus there is 20 feet of pavement for southbound traffic and 20 feet of pavement for northbound traffic with a six foot neutral ground in the center, which has in the middle of it concrete posts approximately ten feet apart with a wire cable running through each post. The cable is approximately three feet from the ground. It would be necessary for one crossing Scenic Highway at this point to step up on this neutral ground, walk three feet, step over the cable, walk three more feet on the other side and then cross the two north traffic lanes. The day was clear and visibility excellent at the time of the accident, and there were no obstructions other than as described in the neutral ground and no traffic to obscure Deason's view other than the front width of the Greyhound bus. However, he had a full view after reaching a point in the highway where he could see down the side of the Greyhound bus. Deason got his suit case, alighted from the Greyhound bus, walked around the front and started across Scenic Highway and had proceeded across the ten foot west lane for southbound traffic and into the east lane for southbound traffic approximately two to four feet when he was struck by the truck owned by Porter Kent and being driven by Rudolph Knight. In the truck with Rudolph Knight were two passengers or co-employees, viz., Johnny Jackson and William Walls. As Deason prepared to alight from the Greyhound bus, Pouns, defendant and driver thereof, said to him, "Watch your step. Please be careful." Deason alighted and Pouns then checked his rear view mirror for approaching traffic and saw the Kent truck about the rear or center of his bus and immediately looked back to see whether Deason was in danger. Upon seeing Deason in the path of the oncoming truck he "hollered" something in the nature of a warning. Deason at that time or as a result of the warning "froze" at the point of collision.
*355 The first contention of counsel for plaintiffs is clearly stated in his brief and we take the liberty of quoting therefrom:
"Pursuant to the signals given by each bus driver, the Greyhound bus was brought to a stop in the west or outside lane for south bound traffic on Scenic Highway, approximately 150 feet north of the intersection of Scenic Highway and West Mason Street. The Greyhound driver knew that Mr. Deason was to cross Scenic Highway to board the Trailways bus which was travelling north but which at the time of the transfer south of the front of the Greyhound bus. The Trailways bus was to be brought to a stop approximately adjacent to the Greyhound bus but on the east side of Scenic Highway. Mr. Deason was struck by the Kent truck as he was making the transfer across the street.
"It is plaintiffs' position that once the Greyhound driver gave these predetermined signals for a transfer to the Trailways driver who acknowledged the same a contract was in effect between these two companies to transfer Mr. Deason from one bus to the other as a passenger. It is our contention that pursuant to these prearranged signals, understood and acknowledged by each driver, the two companies through their employees did select the time, the place, and the route of the transfer. It is our further contention that the two carriers having selected the time, the place, and the route of the transfer, bore the responsibility for the transfer as a matter of law."
In aid of plaintiffs' contention as above set forth, counsel cites much law, both general upon the question of the relationship of carrier and passenger and special in the nature of cases in our jurisprudence and that of other jurisdictions. However, counsel relies mainly upon the case of Rourke v. Hershock, 1950, 3 N.J. 422, 70 A.2d 489. Thompson v. New Orleans Ry. & Light Co., 1921, 148 La. 698, 87 So. 716, rehearing denied 2/28/21.
Of these two cases counsel for plaintiff had the following to say and we quote from his brief:
"We hesitate to cite to Your Honors a decision of one of another state before citing the decisions from our own State. However, because it is the one case in the United States of America practically identical with the present case we shall discuss at length a 1950 case arising in the State of New Jersey. We refer to Rourke v. Hershock (Sup.Ct.N.J. 1/9/50) 3 N.J. 422, 70 A.2d 489.
"In the Rourke case plaintiff was hit by an automobile as he was transferring from one of the defendant's busses to another, across a highway. Plaintiff brought suit against the carrier and also against the motorist who struck him. The jury found for the motorist and rejected the demands of plaintiff against the motorist. However, the jury found for plaintiff against the carrier and the Court of Appeal of New Jersey affirmed the decision, and it was subsequently affirmed by the New Jersey Supreme court.[1].
"The only distinction between the Rourke case and the present case is that in the Rourke case both busses were owned by the same company. Here, since Greyhound and Trailways were engaged in a joint enterprise to transfer Mr. Deason from one bus to the other there is no valid basis for any distinction.
"The facts in the Rourke case are so similar to the facts in the present case we shall recite them in detail. In the Rourke case, the bus in which plaintiff was a passenger signaled to the second bus to stop *356 so plaintiff could be transferred from one bus to the other in order to complete his journey. Both busses stopped at which was not normally a transfer point. Plaintiff got off one bus and went across in front of it, preparing to cross the highway to board the second bus. Because of the position of the busses plaintiff could only see about 100 feet. The driver of the bus from which plaintiff was being transferred did not warn him of the approach of an overtaking automobile (exactly as here). Plaintiff was struck by the overtaking automobile. He sued both the driver of the automobile and the bus company. The bus company contended that it owed no duty to plaintiff except to deposit him at a point where he could safely reach the side of the road to the right of the bus. In affirming the judgment for plaintiff, the Supreme Court of New Jersey said:
"`We think that the duty of the defendant did not end with the delivery at a point where access could safely be had to the roadside at night. The passenger was acting under the personal direction and oversight of the driver. The ride was not ended when he alit. He was still in the physical presence, and was obeying the instructions, of the driver and transferring from one to another of defendant's vehicles. There were numerous incidents with respect to which the defendant could have exercised greater care, among them the selection of relative location, the position in which the bus was stopped, placing of busses with respect to each other and the passing traffic, advanced general warning to the passenger of the danger from passing traffic, watchfulness for movement of the vehicles in season to give audible and efficient warning to the passenger. It may be that as to no one of these elements did the defendant violate a duty ordinarily owing to a disembarking passenger and yet that the combination of these elements together with an invitation to leave the bus under the named circumstances created an unusual condition from which an unfulfilled duty arose. (Emphasis supplied.)'
"In the Rourke case the defendants cited many cases contending that their duty was over when they discharged the passenger on the right side of the bus, and contending that the driver of the bus to which plaintiff was being transferred did not owe plaintiff a duty because plaintiff had not as yet reached that bus. In effect, they said, as do defendants in the present case, `Rourke was a stranger:'. They, as defendants in the present case, cited many cases from the Supreme Court of the State of New Jersey to the general effect that the contract was completed when the plaintiff was delivered to a safe place on the side of the road and not begun again until the plaintiff boarded the other bus. In distinguishing the various other cases previously decided by the New Jersey Supreme Court the Court made some very pertinent observations which we believe are applicable to the case at bar. The Court laid great stress on the implied invitation of the route to be taken by the transferring passenger. In distinguishing one of the cases cited by the bus company the New Jersey Court said:
"`Nor was there any invitation, directly or indirectly, extended to her as to what route she should take. In making the transfer she was exercising her own judgment.'
"Here, there was no question but that the route to be taken by Mr. Deason was selected by the bus companies. They selected the time, the place, and at least impliedly, the route of the transfer.
"As above stated, in the Rourke case, the New Jersey Supreme Court concluded that the carrier was responsible even though the plaintiff was on the highway at the time of the accident and was struck by another vehicle. This is the identical situation we have here. The Court held that under the circumstances, and particularly *357 the fact that the transfer was being made simultaneously from one vehicle to another, as well as other relevant factors, the situation was such that the duty of passenger and carrier continued in existence. It is respectfully submitted that this is the situation existing in the present case.

* * * * * *
"While Rourke is more analogous to Deason because of the nature of the accident (facts) than any other case reported in the United States, there can be no question but that the Louisiana Supreme Court decision in the case of Thompson v. New Orleans Ry. & Light Company, 1/3/21, 148 La. 698, 87 So. 716, rehearing denied 2/28/21, decides the question of Mr. Deason's status as a passenger while making the transfer from one bus to another at a time, place, and over a route selected by the carrier. There, the deceased was being transferred from one street railway car of defendant to another and to do so it was necessary for her to cross a canal on the bridge of a steam railroad. While the deceased was crossing the bridge a train approached. Confusion ensued due to the approaching train and the deceased fell from the bridge into the canal and was drowned. Suit was filed against the street railway company for damages and a jury found for the defendant. The Supreme Court reversed and granted judgment to plaintiffs. In so holding the Court said:
"`The condition which developed and produced the deceased's confusion and doubtless caused her to fall had a result but naturally to be expected; and the failure to warn and safeguard her was the proximate cause of her death.'
"It is respectfully submitted that the decision in Thompson is still the law of Louisiana and is authority for the legal proposition that when a transfer is being made from one vehicle to another at a time, place, and over a route suggested by the carrier the status of passenger continues."
Counsel for plaintiffs then argue that as they have established Deason's relationship as that of a passenger of both bus companies at the time of his accident and injury, that the law applicable is set forth in the case of Hayes v. Illinois Central Railroad, 83 So.2d 160, 162, decided by this court and we quote therefrom:
"The applicable law does not seem to be disputed.
"`It is well established that a carrier of passengers is not an insurer, but it is required to exerise the highest degree of care, vigilance and precaution for the safety of those it undertakes to transport and is liable for the slightest negligence. * * * It is also well established in our jurisprudence that, where a passenger is injured in an accident and has failed to reach his destination in safety, the burden is on the carrier to prove itself free from fault'. Gross v. Teche Lines, Inc., 207 La. 354, 21 So.2d 378 at page 380. See Mire v. LaFourche Parish School Board, La.App. 1 Cir., 62 So.2d 541 for a recent case summarizing some later jurisprudence and stating: `* * * the carrier is required to do all that human sagacity and foresight can do under the circumstances, in view of the character and mode of conveyance adopted, to prevent injury to passengers, the carrier being held liable for the slightest negligence, with reference to the exercise of such care * * *.' 62 So.2d 541, at page 543."
Counsel then cites the case of Mire v. LaFourche School Board, 62 So.2d 541, decided by this court in which we quoted (and counsel quotes in his brief) the general law as stated in 10 C.J., Carrier, Sec. 1294, p. 854, and in the same volume at page 856, Sec. 1296, 13 C.J.S. Carriers, §§ 676, 678.
At this point we wish to state that we do not believe that the Mire case is controlling of the present case for in the former it dealt with the specific duty of a *358 school bus driver toward his school children passengers, and the facts revealed that he had specifically violated a special duty imposed on him by the terms of his contract with the LaFourche Parish School Board. We quote from the case two regulations violated by the School bus operator, viz. [62 So.2d 544]:
"* * * Two of these regulations were as follows:
"10. Bus drivers who load or unload children on a main highway shall signal that a stop is to be made. After the bus comes to a standstill, the driver shall get out of the bus, look both ways for approaching cars, and shall not permit children to get on or off the bus until it is safe for them to do so. (Italics ours.)
"13. All school busses shall be driven by the person in whose name the contract is issued. The operator shall name in his contract a substitute, acceptable to the Board or Superintendent of Schools. The substitute shall only serve in the event of the operator's sickness, or when the operator has received permission from the Board or Superintendent of Schools to be absent from regular duty.
"It is our opinion that under regulation 10 above, it was the duty of the bus driver to get out of the bus and so remain out and ascertain and see that it was safe for the children to cross the highway, or in other words, to see that the children safely crossed the highway.
"In this case Rivere did not get out of the bus to give aid to any of his young passengers; in fact, he testified that he did not even know that such a requirement was in his contract because he had never read it and that it was the custom for him and other drivers to never get out of their busses to give assistance to the children. The practice of giving assistance to the children was only begun after plaintiff's child was injured. Rivere would have it appear that the small children were as safe in the hands of Kenneth Folse, the 15-year old passenger who was somewhat of a baseball and football player, as they would have been had he, Rivere, personally gotten out to look after their safety. This may of course have been true; a driver who had never read his contract could probably not be expected to be a safe custodian for small children. But, nevertheless, Rivere was the one who had contracted to transport and look after the children; and he had no authority to delegate his duties to anyone else except with the approval of the School Board or the Superintendent of Schools. In not getting out and looking to see if the road was clear before his 7-year old passenger was allowed to start across the road, in violation of his contract, he was negligent; and in delegating part of his duty to a minor without authority he was negligent. The accident suffered by Lois Mire was just the kind of accident that the requirements in defendant's contract were designed to prevent.
"In the third place Rivere was negligent in not seeing what he should have seen. He testified that he did not consider it necessary for him to get out of the bus to look for traffic coming from the rear for the bus had somewhat recently been equipped with a new and specially designed rear-view mirror which enabled him to see toward the rear as well as from the inside as he could if he had gotten out. If this statement was correct then he apparently was not using the facilities at his disposal, for he testified elsewhere that he did not see the car driven by Chouest until it was in the act of passing the bus. The rule that one is negligent in not seeing what he could and should have seen is too well established *359 to require the citation of authorities."
Counsel for plaintiffs then sums up the negligence of the driver of the Greyhound bus and of the Trailways bus and we again quote from his brief:
"It is respectfully submitted that this Court's decision in the Mire case is square authority for the proposition that the Greyhound driver was guilty of negligence in the present case with reference to the location selected for the discharge of Mr. Deason and the method selected for having Mr. Deason transfer from the Greyhound bus to the Trailways bus. Here it is clear that Mr. Deason had not reached his destination at the time of the accident and both drivers knew his destination was the Trailways bus. In fact, the busses stopped at the location for the express purpose of having Mr. Deason transfer from one bus to the other.
"It can hardly be argued that either bus company exercised toward the late Marcus C. Deason the degree of care owed by a common carrier to its passenger, Mr. Deason, the evidence shows (this testimony being given by his widow), had never before been to Baton Rouge. The plan for a transfer had its place and origin with the two bus companies. Despite all this, neither driver gave any instructions whatever to Mr. Deason; no one gave him any warning whatever; the Greyhound driver either did not look to see where Mr. Deason went or did not see if he did look despite his position of vantage high in the front of the bus; the Greyhound driver, though travelling admittedly in heavy traffic, did not look to his rear at all to see whether or not his passenger could safely make the transfer; in fact, Mr. Deason, a stranger in a strange community, was put down at such a time and at such a place with reference to the two busses at the time that he did what he was at least impliedly invited to do,cross the front of the Greyhound bus to catch the Trailways bus."
Counsel for defendant, The Greyhound Corporation and its driver, James W. Pouns, in answer to counsel for plaintiffs counters with the following argument and we quote from his brief:

"Issues As To Greyhound and Its Driver, James W. Pouns
"1. Was James W. Pouns chargeable with actionable negligence under the provisions of Article 2315 of the Revised [LSA] Civil Code for the injuries received by Marcus C. Deason, who was struck by a vehicle driven by the defendant, Rudolph Knight; if this question is answered in the negative and it is found that James W. Pouns was not chargeable with actionable negligence, then the judgment of the Trial Court should be reversed as to these defendants and plaintiff's suit dismissed with cost; if, however, the question is answered in the affirmative, then
"2. Was Marcus C. Deason chargeable with and guilty of negligence, which was the or a proximate cause of the accident sued on by walking or running into a main arterial highway and in the path of an oncoming vehicle from behind the parked bus, without first observing approaching traffic and ascertaining whether said highway could be crossed in safety; if the answer to this question is in the affirmative, then the judgment of the Trial Court was erroneous and should be reversed as to these defendants, even though it is found that James W. Pouns was chargeable with negligence.
"Counsel for plaintiff contended and urged in the Trial Court, and will no doubt contend and urge in this Honorable Court, that Marcus C. Deason was a passenger on the Greyhound bus at the time he was struck in the highway by the vehicle driven by Rudolph Knight. We do not now, nor have we ever believed this to be an issue in the case. It has been, and is now our *360 opinion, and we believe the position is amply and universally supported by the authorities that (1) the relationship of carrier and passenger terminated where Marcus C. Deason alighted from the Greyhound bus in a safe place; and (2) the gross negligence of Marcus C. Deason in running into the highway without looking and into the path of an oncoming truck would bar recovery, even if such relationship had existed after he alighted from the bus.

"Law And Argument.

"In suits for the recovery in tort based on negligence of the carrier, where the carrier-passenger relationship exists or is claimed to exist, the laws or jurisprudence follow a rather universal pattern. Since practically all of the purported cases dealing with either the question of negligence or the question of the carrier-passenger relationship necessarily involve the other, the following discussion pertains both to the negligence of the carrier and the existence of the carrier-passenger relationship.
"Although it appears obvious to us, under the jurisprudence of Louisiana and all other states, that Deason ceased to be a passenger of Greyhound at the moment he safely alighted in a safe place on the neutral ground west of the Scenic Highway, we are, nevertheless, compelled to brief this proposition, since plaintiff contends that Deason was a passenger of Greyhound at the time he was struck by the Porter Kent truck. Again, even conceding arguendo that Deason was a `passenger' at the moment of impact, there could still be no recovery because of his gross carelessness and negligence. A carrier is not an insurer of the passenger.
"It is well recognized that the relationship of carrier and passenger is created by what is in effect a contract by which the passenger pays a consideration for transportation to a designated destination and places himself under the control of the carrier for such purpose. The question of whether the carrier has custody or control of the alleged passenger is often determinative of the relationship which exists between the parties.
"It is a rule of universal acceptance that the carrier is required to use the highest degree of care, diligence, and skill in receiving its passengers, conveying them to their destination and setting them down safely as the means and character of the conveyance and circumstances will permit. Hopkins v. New Orleans Railway & Light Co., 150 La. 61, 90 So. 512 [19 A.L.R. 1362]; Wallace v. Shreveport Railway Co., La.App., 175 So. 86; and Baptiste v. New Orleans Public Service, Inc., La.App., 161 So. 783; 145 A.L.R. 1206 (Annotation).
"A carrier of passengers, however, is not an insurer of passengers' safety. Matteson v. Teche Greyhound Lines, La. App., 178 So. 272; Baptiste v. New Orleans Public Service, Inc., La.App., 161 So. 783; 145 A.L.R. 1206; Valdry v. Baton Rouge Bus Co., La.App., 5 So.2d 173; Oppenheim v. Toye Bros. Yellow Cab Co., La.App., 7 So.2d 420, affirmed 203 La. 1067, 14 So. 2d 854; Pierce v. Toye Bros. Yellow Cab Co., La.App., 8 So.2d 562, affirmed [La. App.], 11 So.2d 236; Kendall v. New Orleans Public Service, Inc., La.App., 45 So. 2d 541; and the standard of care required of a carrier is qualified by the reciprocal duty of the passenger not to contribute to such injury by any want of ordinary care. Pero v. Shreveport Railway Co., La.App., 78 So.2d 66; Harris v. Shreveport Railway Co., La.App., 83 So.2d 517; and Baker et ux. v. Shreveport Railway Co., La.App., 68 So.2d 228; 145 A.L.R. 1206.
"But where the purported passenger does not have the status of a passenger the carrier owes only the same duty to such person as it does to the public generally; namely, the duty of exercising reasonable care and diligence in the operation of its vehicles. Barringer v. Employer's Mutual Liability Insurance Co., La.App., 62 *361 So.2d 173; Williams v. Shreveport Yellow Cab Co., La.App., 183 So. 120; 7 A.L.R. 2d 564.
"Where (with the possible exception of persons under disability) the duty of a carrier to provide a safe place to alight has been fulfilled and the passenger has left the vehicles, the carrier ceases to owe to the passenger any special duty other than that which it owes to all persons coming within the range of its activitiesthat is, not to do them injury by a failure to exercise reasonable care. Barringer v. Employer's Mutual Liability Insurance Co., supra; Pugh v. City of Monroe, La.App., 6 So.2d 83; Stewart v. New Orleans Public Service, Inc., 4 La.App. 543; Duvernet v. Morgan's Louisiana & T. R. R. Co., 49 La.Ann. 484 [21 So. 644]; and McKernan v. New Orleans Railway Co., 144 La. 997, 81 So. 601; 145 A.L.R. 1206.
"In the case of Pugh v. City of Monroe, La.App., 6 So.2d 83, the plaintiff held a transfer ticket from one bus of the defendant to a second bus which she was attempting to board at the time of the alleged accident. The operator of the first bus was charged with negligence in encouraging and advising plaintiff to hurriedly proceed to the second bus `when he knew or should have known that the bus might start without giving her a fair opportunity to board it,' and the failure to sound a gong or otherwise signal his arrival at the intersection so that his bus's presence might be observed by the operator of the other bus, and failure to notify the second bus that passengers on the first bus, including plaintiff, desired to transfer. The court properly held it was not negligent for the bus operator to suggest to a passenger that if he hurries when leaving the bus he may catch another bus; that when the operator of the bus safely unloads a passenger in a place of safety, the operator completely discharged to the passenger the duties resting upon the operator's employer as a common carrier, notwithstanding the operator knew that a transfer entitled the passenger to ride on another bus; the fact that plaintiff, who was injured by falling when attempting to catch defendant's second bus, had a transfer ticket issued by the operator of the first bus did not place plaintiff in the status of a `passenger' while enroute between the buses, and, consequently, the defendant did not owe the plaintiff the high degree of care resting upon a common carrier to its passengers. And finally, it was held the injuries sustained by plaintiff while attempting to catch the second bus of defendant warranted conclusion that proximate cause of the accident was plaintiff's own negligence. It is urged that this case alone, in which a writ of certiorari was denied by the Supreme Court, is determinative of the issues adversely to the plaintiff.
"Certainly, if the status of carrier and passenger does not exist where a passenger with a transfer from one vehicle to another of the same defendant and where the operator of the first vehicle advises the plaintiff that she may catch the second vehicle if she hurries, it is inconceivable that such status would exist where there is no transfer between vehicles of transportation of the same party, but it is necessary that the plaintiff change to vehicles of different ownership and operation in order to reach his destination. A similar conclusion was reached in the case of Carey v. New Orleans Public Service, Inc., 3 La.App. 217."
Counsel for Trailways and Sherman Franks, its driver, argued and contended and we quote from his brief as follows:
"We ask the court to recall that Trailways at no time had control of Mr. Deason, actually or otherwise. It had no right over his person. It could not legally tell him to do one thing or another because he was not its passenger, and had never placed himself in its custody, nor in its constructive control. He was, as to Trailways, nothing but a member of the general public with the right and power to advance or to recede as he elected. He had the right to become a passenger, but *362 he also had the right at any time to change his mind. He had bought no ticket, he had paid no fare and he could have decided, even after reaching the neutral ground between the two busses, that he would not board our bus, but on the contrary would remain in Baton Rouge or go elsewhere. In the absence of any custody or control, and in the absence of all other things, we submit that this man never became our passenger and that the cases plaintiff relies upon do not apply to our situation."
In addition counsel for Trailways strenuously contends that Deason was guilty of contributory negligence which bars his recovery, and that his client, Trailways, and Sherman Franks the driver thereof, were guilty of no negligence whatsoever.
There is no dispute as to the law governing the case under consideration, and it is fully and correctly stated in the quoted contentions of the plaintiffs and defendants. There is a sharp clash between plaintiffs and defendants as to the status of Deason at the time he was struck by the Kent automobile. Was he a passenger of Greyhound and/or Trailways at that time. If he was a passenger of both bus companies or either at the time he was struck by the Kent automobile, a prima facie case of negligence was established against both or either as the case may be, after which the bus company or companies had the duty of proving their, or its, freedom from negligence to overcome the passenger's prima facie case. Of course, if Deason did not have the status of a passenger, the carrier owed him only the same duty as it did to the public generally, that is, the duty of exercising reasonable care and diligence in the operation of its vehicles so as not to do them injury.
Under the facts of this case we do not believe that Deason was a passenger of Greyhound or Trailways at the time he was struck by the Porter Kent truck. We cannot agree with the contention of counsel for plaintiff that Deason's destination was a safe boarding of the Trailways bus. There is nothing in the evidence to show that there was any understanding or contract of carriage on the part of Greyhound to deliver Deason safely on board the Trailways bus. His destination when he boarded the Greyhound bus, and at his own request, was the City of Baton Rouge, at a point to be determined by the meeting of the Greyhound and Trailways bus. Greyhound carried out its contract when it stopped on the right side against the curb of the Scenic Highway and Deason was given a safe place to alight. There was nothing wrong with Deason's senses and the dangers of traffic on Scenic Highway was obvious and apparent to Deason and he needed no warning nor was the driver under a duty to warn him of a danger which was apparent, obvious and known to every person in good mind and sense.
Counsel for plaintiffs argue that Deason had never been to Baton Rouge before. We cannot see how this affects the case. He was injured and killed crossing a busy four lane highway which he had been riding on in the seat behind the bus driver, and the bus had been travelling in the right hand lane. Even if he did not observe that it was a four lane highway when he got off the bus he knew it was a highway and that he had to cross it and was chargeable with the knowledge of the obvious danger of crossing a street or a two lane highway or a four lane highway. The plan for a transfer was Deason's own. The bus companies were merely making it possible for him to carry out his plan of transfer when the Greyhound bus stopped in a safe place for Deason to alight and the Trailways pulled off on the opposite side of the highway so that Deason might cross the highway and become a passenger of the Trailways.
We believe that the case of Pugh v. City of Monroe, supra, and Carey v. New Orleans Public Service, Inc., supra, both cited in quotation from defendant's brief, are applicable under the facts to the case at *363 bar. In the Pugh case the plaintiff held a transfer ticket from one bus of the defendant to a second bus and was injured while attempting to board the latter. The operator of the first bus was charged with the following act of negligence [6 So.2d 84]:
"1. Encouraging and advising petitioner to hurriedly proceed to the bus on Jackson Street when he knew or should have known that the bus might start without giving her a fair opportunity to board it;
"2. That he did not sound the gong nor otherwise give signal or notice of his arrival at the intersection so that his bus' presence might be observed by Paulus, the other operator; and the failure to notify Paulus that passengers on his (Duke's) bus, including petitioner, desired to transfer."
The court held that the charges of negligence were wholly without merit even though true, and then specifically held:
"When Duke safely unloaded plaintiff at the intersection he completely discharged to her, so far as he was concerned, the exacting duties resting upon his employer, the city, as common carrier; and this, too, notwithstanding he knew that the transfer entitled her to ride on the other bus."
The same may be said of the Greyhound that when it safely unloaded Deason on the west side of the Scenic Highway it completely discharged to him, so far as it was concerned, the duties resting upon it, as the common carrier, notwithstanding that its operator knew that Deason intended to cross the Scenic Highway in order to become a passenger on the Trailways bus.
Counsel for plaintiff attempts to distinguish this case on the ground that the operator of the bus (Paulus) had no notice that plaintiff wished to board his bus. This in no wise changes the statement of the court with regard to the bus from which plaintiff had alighted. Nor is that portion of the case as to the second bus applicable to Trailways for plaintiff in the cited case was injured by the second bus in attempting to board it unknown to the operator, whereas in the present case the facts are, of course, entirely different. Deason was injured in attempting to cross the Scenic Highway by a third party, the Kent truck.
In the Carey case, the court stated:
"It is argued for plaintiff that because he held a transfer from the Desire car to the car by which he claims to have been hurt, he was entitled to continue on his journey in the capacity of a passenger to whom the defendant owed due consideration and protection, such as should be given to all passengers. We have not been referred to any authority, nor have we been able to find any, in support of this contention. We cannot take such a view of this case which, in our opinion, fails to establish any negligence whatever against the carrier. The judgment appealed from is, in our opinion, correct, and will be affirmed."
There are many cases in other jurisdictions which hold exactly as the two above cited. In the case of Parker v. Birmingham Electric Co., 254 Ala. 488, 48 So.2d 873, 875, we find the following statements made by the court:
"We think it can be fairly stated that there is nothing in the count to show that the plaintiff alighted at any other point than her true destination or that the stop at which she alighted was not a regular and safe stop for passengers to alight, other than possible danger from traffic on the super four-lane highway accentuated perhaps by the fact that it was raining and dark. In fact there is no allegation that indicates that the place of alighting was not on the public highway or that defendant was not authorized to discharge passengers on the highway. We think it should further be said that the danger to be inferred from the *364 allegations of the count is not a danger caused by the condition and place of alighting, but only the danger to plaintiff in attempting to cross the super four-lane highway to get to the other side. In other words, there is no allegation that there was any danger surrounding the place of alighting if the plaintiff had remained there and had waited for the bus to proceed before attempting to cross the highway. There is no allegation that she was injured by any subsequent movement of the bus while at the place of alighting or that there was any trap, pitfall, unevenness of ground or other condition which would have rendered the landing place unsafe.
* * * * * *
"`It is the duty of the street railroad carrier to provide a reasonably safe place for the landing of its passengers, as explained in Montgomery Street Ry Co. v. Mason, 133 Ala. 508, 32 So. 261, and other of our cases; but this rule has no reference to independent agencies operating in the street such as the motorcycle mentioned in plea 2. The carrier is no more responsible for them than is the passenger. * * *
"`Defendant's charge 3, was clearly correct. The carrier's full duty in the absence of special circumstances of which there is no intimation in this record, is performed when the passenger is safely deposited on the ground. If afterwards the passenger walks into danger or harm overtakes him by reason of the intervention of an independent agent the carrier cannot be held for that.'
* * * * * *
"Thus it appears from the foregoing decision the court in deciding the Willingham [Willingham v. Birmingham Ry., L. & P. Co., 203 Ala. 351, 83 So. 95] and Hammett [Hammett v. Birmingham Ry., L. & P. Co., 202 Ala. 520, 81 So. 22] cases, did not depart from the general principle that the carrier must furnish a reasonably safe place for the passenger to alight and must, generally speaking, afford the passenger a reasonable opportunity to leave the carrier's roadway or station in safety. The distinction is that the carrier does not fail to provide a reasonably safe place to alight if the passenger is lawfully discharged in the public street and if the danger surrounding the alighting or place of alighting arises only out of the movement of such an independent agency * * * as assault or injury by third persons over whom the carrier has no control.
"In order for count 6 to be held good the facts alleged must as a matter of law and unequivocally show that the defendant did not provide a place reasonably safe for alighting. The allegations of fact are that when the plaintiff stepped to the ground, it was dark and raining, that plaintiff could not see traffic approaching from the east, that the highway was a four-lane super and muchly used by motor vehicles in each direction. The conclusion is then alleged that `said highway at the point where plaintiff was caused to alight was highly dangerous to pedestrians.' Thus conclusion construing the allegations against the pleader, is not equivalent to an allegation that the place of alighting is a place unsafe for passengers alighting from the bus. A pedestrian is defined as a `walker, one who journeys on foot.' Webster's New International Dictionary. It must be kept in mind that the whole basis of the plaintiff's cause of action, if any, must be rested on the duty growing out of the relationship of carrier and passenger. If the plaintiff in the present case is not a passenger at the time of injury, then there can be no right of recovery. If the place at which the plaintiff was *365 caused to alight was highly dangerous to pedestrians, this could mean that it was dangerous to one walking along the street, because such person might be struck by another vehicle or through the intervention of an independent agency for which the carrier cannot be held liable. Authorities, supra. In other words the word pedestrian creates a field of operation which could be larger and different from that on which liability can be predicated. `One who alights from a street car upon the street and is in safety from any contact or collision with the street car ceases to be a passenger, and, as regards injury sustained in tripping over some object or being struck by another vehicle, has the status of an ordinary pedestrian.' Wullbrandt v. City of Seattle, 196 Wash. 645, 84 P.2d 123, 125."
As stated by the court in the above cited case we think that Deason alighted at the destination requested by him when he boarded the bus at Centerville, Miss., and that the stop by the Greyhound bus on the right side of the Scenic Highway was not dangerous or unusual but rather emphasized one of the reasons why passengers ride busses, viz., they may have the bus stop at any point on the street or highway where they can safely alight for their own convenience. The only possible danger in such a stop to a passenger is from traffic, and in this case as in the cited case, it was a super-four lane highway, and in the cited case the danger was accentuated by the fact that it was raining and dark. This is not true in the case at bar as it was in the morning on a clear day with excellent visibility. The only danger which Deason was subjected to by Greyhound's stopping where it did at his request was only the danger to him in attempting to cross the four lane Scenic Highway to get to the other side.
The Parker case, Pugh and other cases whose facts are similar or the same are based upon the general rule of law that a carrier completes the contract of safe passage when it brings the passenger to his destination and provides a safe place for him to alight. Counsel for plaintiffs rely mainly upon the Rourke and Thompson cases, supra, but these cases are not apposite to the case at bar for there were extraordinary facts which plainly showed that the relationship of passenger and carrier had not terminated at the time of the accident and injury to the plaintiff, and plaintiff was not guilty of contributory negligence.
In view of the great stress placed upon the decision in the Rourke case we feel at liberty in quoting somewhat in detail from that case in order that we might distinguish it from the case at bar. The facts in that case are stated by the court as follows:
"On a dark night, January 21, 1947, plaintiff, knowing his destination only by name and unacquainted with the territory covered by the route, entered the defendant's bus at Elizabeth, paid his fare and told the driver he wanted to go to Barber. Plaintiff was carried beyond his destination and was let out at Perth Amboy where he entered another of defendant's buses. He asked the driver of that bus whether it went to Barber, and was told that it did. He explained that he had just been carried beyond Barber and wanted to go there, and the driver said he would let him out at that place. Plaintiff paid his fare, took a seat and the bus started. Presently plaintiff again asked the driver to tell him when the bus reached Barber and the driver once more undertook to do so. After a few minutes plaintiff went to the driver and asked `How about Barber?' The driver said, `We passed it. I will stop a bus coming down the other way and tell him to let you off there'. After a few minutes the bus stopped near a bend in the road at a point about one hundred sixty feet up a three-hundred-foot grade over a railroad overpass. It was not a transfer point, but the plaintiff did not know *366 that and was not informed. The driver signaled a bus going in the opposite direction and that bus stopped also, in such a relative position as that, in effect, the roadway space available for moving traffic was narrowed by the width of the two vehicles. The driver of the first bus told the driver of the second that he had a passenger for him; that he wanted the passenger taken back to Barber because he had `overridden'. He also told plaintiff to go around the front of the bus on which he then was and get on the other bus. Plaintiff, following directions, got off, and passed around the front of the first bus in the direction of the second; as he did so the two drivers were in conversation with each other. He looked to his right and saw that there was nothing coming. At the edge of the bus he looked to his left. Because of the angle at which the bus was placed with respect to the curve he could see only about a hundred feet, but there was nothing within his line of view. He was not warned by the driver about the approach of an automobile. He took a couple of steps more toward the other bus and as he did so saw the headlights of a car, then distant about one hundred fifty feet, coming rapidly from his left. He did not try to complete the crossing lest he could not make it; he hesitated to retreat fully into the path of the bus he had just left lest that vehicle start up and hit him. So he stepped back close to that bus but not in its way. He was struck by the oncoming car and seriously injured. He brought this suit against the carrier and the car-driver. The jury returned a verdict for plaintiff as against the defendant carrier, but a verdict of nonsuit in favor of the car driver. The Appellate Division affirmed [Rourke v. Public Service C. Transport] 4 N.J. Super. 44, 66 A.2d 341. We certified the case on defendant's petition. The alleged trial error before us is the refusal of the court to direct a verdict for the defendant.
* * * * * *
"It was competent for the jury to find a state of facts leading to the conclusion that the relationship of carrier and passenger had not ended. The facts are not free of dispute; we have stated them in a way that assumes the truthfulness of the plaintiff's evidence and of the inferences of fact that may be legitimately drawn therefrom, for such was the attitude the trial court was obliged to assume in disposing of the motion. The carrier had twice taken its passenger beyond his destination; the last time against the certain and reiterated promise of the driver to discharge him at the place where he wanted to go. The night was dark and the passenger was in strange surroundings. He first relied upon defendant to drop him where he wanted to go and later, that having failed, upon the driver's instructions as to what he should do and how he should do it in order to be taken, as a passenger, to his destination. Assuming the facts to be as we have recited, we think that the duty of the defendant did not end with delivery at a point where access could safely be had to the roadside on the right. The passenger was acting under the personal direction and oversight of the driver. The ride was not ended when he alit. He was still in the physical presence, and was obeying the instructions, of the driver in the transfer from one to another of defendant's vehicles. There were numerous incidents with respect to which defendant could have exercised greater care, among them the selection of relative location, the position in which the bus was stopped, the placing of the buses with respect to each other and the passing traffic, advance general warning to the passenger of the danger from passing traffic, watchfulness for movements of other vehicles in *367 season to give audible and efficient warning to the passenger. It may be that as to no one of these elements did the defendant violate a duty ordinarily owing to a disembarking passenger and yet that the combination of these elements together with an invitation to leave the bus under the named circumstances created an unusual condition from which an unfulfilled duty arose. Gore v. Delaware, Lackawanna & Western Railroad Company, 89 N.J.L. 224, 98 A. 389 (E. & A.1916). We think that the jury might, from the proofs, spell an invitation which placed upon the defendant an unmet duty to use care commensurate with the danger to be reasonably apprehended therefrom. The passing, in speed, of an automobile on the highway was a danger to be reasonably apprehended."
In the Rourke case the passenger had never arrived at his destination due to the negligence of the carrier, and when he was hurt was still in the process of being conveyed there by the carrier under his contract of carriage. When he was told to get off of the second bus and get in the third bus he was clearly still under the supervision and control of the carrier. The passenger did what he was told to do by the carrier. The night was dark and the passenger was in a strange country and had a legal right to rely upon the carrier for safe passage since the contract of carriage had not been completed by the carrier, in that the passenger had not been safely put down at his destination. It was the duty of the bus company to select a safe location for the transfer of its passenger to the third bus, and they were responsible under their contract of passage for his safe transfer across the highway. In this duty they failed for according to the facts they selected a place to stop the bus "near a bend in the road at a point about one hundred sixty feet up a three-hundred-foot grade over a railroad overpass." They were also responsible for the position in which the bus was stopped. In this duty they were negligent for the bus was stopped at such an angle "with respect to the curve he could see only about a hundred feet, * * *". Also the court found that they were negligent in the placing of the buses with respect to each other and the passing traffic in that the two buses were so close together that traffic could not pass between them without striking the passenger. The Court also found that in this case the carrier should have given advance warning to the passenger of the danger from passing traffic and should also have watched for movements of other vehicles in time to give audible and efficient warning to the passenger. This latter duty was evidently necessary under its contract of safe carriage and the fact that the carrier was charged with knowledge of the bend or curve in the road and the position of the buses. While the passenger was a stranger, could not see, it was a dark night and was unaware of any close bend or curve from which unseeable traffic might approach. The court specifically stated that "It may be that as to no one of these elements did the defendant violate a duty ordinarily owing to a disembarking passenger and yet that the combination of these elements together with an invitation to leave the bus under the named circumstances created an unusual condition from which an unfulfilled duty arose."
The court in the Rourke case in effect held that the carrier had never completed its contract to safely deliver the passenger to his destination and that the latter, when injured, was under their direct control and supervision and was doing exactly as the carrier told him to do in an effort on the part of the carrier to complete its contract with the passenger. Due to the unusual facts and circumstances and the acts of the carrier which made it impossible for the passenger to protect himself by the ordinary use of his senses while acting under an invitation or order to leave the bus under such circumstances this constituted negligence on the part of the carrier which was the proximate cause of the passenger's accident and injury. In the case at bar we don't have the extraordinary set of facts which would *368 extend the obligation of the Greyhound bus beyond stopping at a safe place on Scenic Highway for Deason to alight when it met the Trailways bus, all of which was in accordance with Deason's request when he boarded Greyhound and paid his fare. Nor was there any obligation on Trailways under the facts to do other than stop at a safe place and wait for Deason should he desire to continue as a passenger on the latter bus. While we doubt that the passenger in the Rourke case could have been guilty of contributory negligence because he failed to look due to the facts heretofore recited in that case, the court found, as a matter of fact, that the plaintiff "looked to his right and saw that there was nothing coming. At the edge of the bus he looked to his left." In the case under consideration there is no testimony that Deason ever looked. We mention that at this time although it probably belongs under a consideration of the plea of contributory negligence.
In Thompson v. New Orleans Railway and Light Co., 87 So. 716, 717, supra, we again quote somewhat at length the facts and holding of the court. We quote:
"Miss Carrie Thompson was a passenger for hire upon one of the Tulane Belt cars of the defendant street railway, traveling from the place of her employment in the business district to her home in the Carrolton section of the city of New Orleans. When the car reached the New Basin canal, over which cars pass on a bridge of defendant in Carrolton avenue, the said bridge was open, and because of some trouble with its mechanism could not be properly closed. The conductor on the car on which Miss Thompson was riding telephoned the barn, and was instructed to issue car to car transfers, and the cars on either side of the canal were rerouted back over the respective ends of the line until the bridge could be closed. The only means for crossing the canal and reaching the cars on the other side for continuation of the passengers' journey was the bridge of a steam railroad about a block and a half distant from that of defendant. The bridge of the steam railroad consisted of a skeleton or trestle-like structure with a plank 12 inches wide running down the center, to be used by employes and not intended for pedestrians; in fact, there were large signs on either end warning against its use in such manner. However, both the conductor and supervisor of defendant, who was present, suggested and invited its use by the many hundreds of passengers who had arrived on either side of the canal, and, as above stated, transfers were given to be used by the passengers, including Miss Thompson, when the canal had been so crossed.
"The bridge of the steam railroad was also open when the passengers began to arrive, and it was some minutes before it was closed. In the meantime, a crowd estimated by the witnesses at several hundreds, had accumulated. The bridge tender refused to close until he heard the signal of an approaching fast freight train, which, according to schedule, passed every day about 6:30 P.M. However, as soon as the closing was made, the crowd began to press forward, and Miss Thompson, among the first to start across (one or two having preceded her and others starting from the other side), had gone only a short distance on the bridge when the train came in view from around a curve, moving slowly. Confusion immediately ensued, and one of the witnesses says that he took a stand at the end of the bridge and attempted to prevent any one else from starting over, but that by this time Miss Thompson had, as stated, progressed some distance upon the bridge. Soon the alarm was given that some one had fallen overboard. The train passed on, and in a few minutes thereafter Miss Thompson was fished out of the canal by a city patrolman and others * * *.
* * * * * *

*369 "The contention of the plaintiffs is that defendant undertook to carry Miss Thompson safely to her destination, and that this included a safe method of crossing the canal when the means ordinarily used had failed; that she had a right to rely upon the superior knowledge of defendant and its agents, who suggested the use of the railroad bridge, and to assume that it was reasonably safe; that as a matter of fact it was not safe to the knowledge of defendant, and that by suggesting its use, as was done, without warning, at a time when it knew that a train was due, and would likely produce the condition of panic among its passengers which followed, was an act of gross negligence, rendering it liable for the death of plaintiffs' said sister.
"Defendant replies that the situation was so obviously dangerous that it was an act of contributory negligence on the part of deceased to have used the bridge, notwithstanding its (defendant's) invitation to do so. And defendant's counsel likens the circumstances of this case to one in which it might have been suggested that the deceased swim across or walk across the canal on a tight rope, which, if accepted, considering her mature age (28) and judgment, would have produced no liability on its part because of the obvious danger.
"However, the record does not show that Miss Thompson knew of the train's schedule which would likely bring it upon the scene at that particular time; nor does it appear that she had any knowledge of its approach until the alarm was given when the headlight came within view around the curve. The track was so constructed that the train came directly from the rear of those who were attempting to cross, and its course only changed when it reached a point near the bridge, and hence the rays of the headlight did not fall upon the path of deceased until it was so near that its presence was naturally calculated to frighten and confuse any one upon the bridge. In view of the late hour, 6:30 P.M. the crowded condition of the street cars, and the constantly increasing number of persons wishing to cross and continue their journeys, it was but natural that their attention would be riveted upon the process of crossing and reaching home; especially in view of the fact that it was rapidly becoming dark, and that section of the city was not very inviting to one left at that hour.
"At least one person and probably more had preceded the deceased across the bridge, and others were coming from the other side; and, in view of all the circumstances, we do not think it was contributory negligence on her part to attempt to avail herself of this means of continuing her journey, which defendant had suggested and invited. On the other hand, we do think that it was highly negligent on the part of defendant to so direct her, without suggestion or warning of the fact that a train was likely to arrive momentarily, and without providing some means of flagging and preventing it from running down the passengers who might be on the bridge. The condition which developed and produced the deceased's confusion and doubtless caused her to fall had a result but naturally to be expected; and the failure to warn and safeguard her was the proximate cause of her death. Hence the defendant is liable. Clerc v. Morgan's L. & T. R. R. & S. S. Co., 107 La. 370, 31 So. 886, 90 Am.St.Rep. 319; LeBlanc v. Sweet, 107 La. 355, 31 So. 766, 90 Am.St.Rep. 303." (Emphasis added.)
The facts in the Thompson case are strikingly similar in some respects to those in the Rourke case, for instance, the passenger had not been carried safely to her destination. She expected to be carried to her home in the Carrolton section which *370 necessitated crossing the New Basin canal, and when the car which ordinarily crossed on a bridge belonging to the defendant arrived there the bridge was open and because of trouble with its mechanism could not be promptly closed, whereupon the conductor on the car was given instructions over the telephone to issue car to car transfers, and following such instructions from their superiors, both the conductor and supervisor of the defendant suggested and invited the use of a railroad bridge which consisted of a skeleton or trestle-like structure and was never intended for pedestrians. Thus we see again that the passenger was acting under the specific instructions of the defendant carrier in order that it might carry out its contract with its passenger, to convey her safely to her destination. The facts show that the passenger did not know the train schedule, nor did she have any knowledge of its approach until the alarm was given when the headlights came within view around the curve. It appears that the track was so constructed that a train came directly from the rear of the passengers who were attempting to cross on the skeleton bridge and it only changed when it reached a point near the bridge and it was only then that the rays of the headlights could be seen and which the court found "was so near that its presence was naturally calculated to frighten and confuse any one upon the bridge." In other words, the deceased in this case could neither protect herself by the use of ordinary senses due to the location of the trestle with respect to a curve in the railroad. Deceased was invited and directed to use a dangerous route by the defendant.
In the case at bar Deason was not told how or when to cross the Scenic Highway. The main difference also is that the Greyhound bus had completed its contract of carriage by placing Deason at his chosen destination safely and without harm. There was no duty upon the driver of the Greyhound bus to personally transport or convey or assist Deason in crossing the Scenic Highway to board the Trailways bus, nor to warn him of traffic on the Scenic Highway as the latter was an obvious danger. Deason, as an ordinary intelligent human being in full command of his senses, knew and could see the obvious dangers which he must avoid if he was to safely cross Scenic Highway, whereas in the Rourke and Thompson cases the plaintiff and deceased, respectively, not only were still enroute to their destination under their contract of carriage with the defendant but also were under the supervision and control of the latter, and used a route suggested and/or ordered by the defendant in order to continue to their destination, which route in both cases due to peculiar facts were most dangerous in that their location was such that neither plaintiff in the Rourke case nor decedent in the Thompson case could possibly protect themselves by looking. The danger was not obvious.
For the above reasons, we do not believe that either case is apposite or controlling.
While the above reasons and holding would mean a dismissal of plaintiffs' suit, we are convinced that Deason was guilty of such contributory negligence as to be a proximate cause of his injury and death, and even though we were to admit for the sake of argument and the consideration of the plea of contributory negligence that Deason was still a passenger at the time of his injury we are of the opinion that his recovery would be barred by his own contributory negligence.
In 13 C.J.S. Carriers § 774, p. 1543, under the title of "Contributory negligence of person injured" we find the following:
"A passenger must exercise ordinary care, and such care only, for his own safety, that is, such care as an ordinarily prudent man would exercise for his safety and security under the same circumstances. No person is ever absolved from exercising reasonable care for his own safety simply because he is a passenger for hire; carriers of passengers have the right to assume that passengers will exercise the care of a reasonably *371 prudent man, and it is a well established rule, that, although there has been negligence on the part of the carrier contributing to the injuries, if the passenger fails to exercise ordinary care, and his failure is proximately connected with his injuries, he is guilty of contributory negligence which will defeat a recovery, and a recovery will be defeated as well where the negligence of the passenger exposes him to injury as where it cooperates in causing the misfortune from which the injury results. However, the negligence of a passenger or intending passenger will not bar his recovery unless it contributes to his injury, and, although the conduct of a passenger has contributed to the injury sustained, yet if such conduct has not been in a legal sense imprudent or negligent, he may recover, provided the carrier is in fault. Moreover, the doing of an act by a passenger of a nature which would ordinarily constitute contributory negligence barring recovery will not necessarily preclude recovery by the passenger where he was induced by the carrier to do such act."
See also Mills v. Illinois Central Railroad Company, 148 La. 217, 86 So. 750; Smith v. Service Cab Company, La.App., 155 So. 774; Dean v. Louisiana Ry. and Navigation Company, 134 La. 793, 64 So. 716; Clerc v. Morgan's Louisiana and P. R. Co., 107 La. 370, 31 So. 886; Hebert v. White Top Cabs, La.App., 8 So.2d 158; Peters v. City of Monroe, La.App., 91 So.2d 428; Jakubec v. Southern Bus Lines, La.App., 31 So.2d 282; Nee v. New Orleans Public Service, 11 La.App. 1, 123 So. 135.
The cases cited immediately above deal with the law as it affects a plea of contributory negligence as applicable to one who is a passenger at the time of his accident or injury. The rule is well stated in the syllabus of the Nee case, supra, that "a carrier is not an insurer of the safety of its passengers, and is not made liable to passengers merely by reason of happening of an accident, and, if it can show that the cause of the accident was something beyond its control or was negligence of passenger injured, no liability results."
Stated again but slightly different in the case of Baker v. Shreveport Rys. Co., La. App., 68 So.2d 228, 231, as follows: "The standard of care required of the carrier is qualified only by a reciprocal duty of passengers not to contribute to such injury by any want of ordinary care."
Bearing in mind the general principles of law applicable to a plea of contributory negligence in a case such as the one under consideration we will proceed to an examination of the record.
It is well to remember that the lower court relieved the driver of the Porter Kent truck which struck Deason of any liability as he found there was no negligence whatsoever on the part of the driver of the truck.
The learned judge below in his written reasons for judgment held that Deason was not guilty of contributory negligence and we quote his reasons for so holding:
"In the Thompson case the Supreme Court rejected defendant's plea of contributory negligence, holding that the result was `but naturally to be expected'. So here, in my opinion. When Deason stepped into the inside traffic lane and was confronted with the row of concrete posts connected by the steel cable, the existence of neither of which it can reasonably be assumed he had any prior knowledge, the result was that but naturally to be expected: he `froze' momentarily. If he had been granted even one more second of time he would probably have been able to retreat or advance to a point of safety insofar as the approaching truck was concerned, but this extra second was not allowed him. It is, therefore, my opinion that Deason was not guilty of any negligence that was a proximate cause of the accident, and that the *372 negligence of defendants was the sole proximate cause of the accident."
We feel it necessary to comment by way of an answer to the above reasons for relieving Deason of any contributory negligence. As previously stated, the facts in the Thompson case relieved the decedent of any contributory negligence. The physical facts in the Thompson case clearly show that even had decedent looked, which it is not shown that she did not do, she would have been unable to see any approaching trains due to the sharp curve in the location of the railroad track. However, had the facts shown that this train was plainly in sight at the time Miss Thompson was invited or told to cross the bridge and she went blindly out on the bridge without looking we do not believe that she would have been relieved of contributory negligence for she would have been guilty of a failure to use ordinary care.
There has also been offered in evidence a picture showing the neutral ground with the row of concrete posts and the wire cable extending through them at a height of approximately three feet in the center of the neutral ground. This picture was taken at the scene. We fail to see anything in the concrete and the wire cable which would cause one crossing the highway to "freeze" even momentarily. They are in the center of a neutral ground six feet wide which it would seem would be looked upon as a haven of safety from traffic in the highway. There was three feet of clear ground on each side of the concrete posts and cable. The testimony is most convincing that Deason "froze" when he looked for the first time and realized that the truck was upon him and that he was certain to be hit.
Counsel for plaintiffs argues that we should accept the testimony of Elsie Dean, a passenger on the Trailways bus at the time Deason was struck. On the trial of the case she testified that the truck of Porter Kent came directly from behind the bus and swerved around to pass the Greyhound bus. In other words, he had been following in the same lane of travel as the Greyhound bus, and when it stopped he swerved from directly behind the bus and struck Deason. This testimony is in direct conflict with that of the other witnesses who testified on this point. It is clearly shown by the testimony of the driver and his two passengers who testified on the trial of the case that the Kent truck came into the Scenic Highway at the Baker intersection and followed the Greyhound bus to where it stopped for Deason to alight and that during this entire trip the Kent truck was driven on the inside or east lane for southbound traffic, while the Greyhound bus was driven in the west lane of Scenic Highway for southbound traffic. In addition the officers who investigated the tragedy testified that the Kent truck skidded an over all distance of 52 feet of which 25 feet was before Deason was struck. These skid marks were all in the east or southbound lane of traffic and were practically straight other than the driver pulled the front end of his truck toward the neutral ground in a vain effort to avoid striking Deason.
Sherman Franks, driver of the Trailways bus, had a clear view of the accident and he testified that just before the truck struck Deason, he saw it at the rear of the Greyhound bus and at that time it was in the opposite lane from the Greyhound bus which would be the east or inside lane for southbound traffic on Scenic Highway. This witness was approximately 40 to 45 feet from Deason when he was struck by the truck and saw him "when he circled around in front of the door I seen him." He described Deason's actions as follows: "When he went around the door he made a dash, you can classify it running fast or slow, whichever one it was, it was a fast dash, out into the highway in the other lane of traffic. And when he got out in the other lane of traffic, evidently he seen the truck, and momentarily I heard the truck, which he froze and which he done like that, a momentary freeze." He testified that Deason was actually stationary when he was struck and that he had gotten approximately within *373 five or six feet in the east lane for southbound traffic or within four to five feet of the neutral ground at the time he "froze" and was struck by the Kent truck.
A Mr. Jeff Barrett, an employee of the Highway Department of the State of Louisiana, was seated on the Greyhound bus to the rear of Mr. Deason when he got off the bus to cross Scenic Highway, and when asked if the latter walked or ran from the door to the point where he was in the highway when he got hit answered, "He was running. He was trying to get to the Trailways bus." He further testified that Deason had gotten approximately five feet within the east lane of southbound traffic.
Rudolph Knight, the driver of the Kent truck which struck Deason, stated that he had followed the Greyhound bus from the intersection of the Baker road and Scenic Highway and that the Greyhound bus had traveled in the west lane for southbound traffic and he had traveled in the east lane for southbound traffic. That at the time or just prior to the accident when the Greyhound bus stopped he had slowed down to 25 or 30 miles an hour and that he first saw Mr. Deason when he was about 25 feet behind the bus, and at this time Deason came out in the east lane for southbound traffic on Scenic Highway. He immediately applied his brakes but could not avoid striking Deason. He is corroborated in his testimony by the two passengers in his truck. Johnny Jackson, one of his passengers, testified that when he first saw Mr. Deason "He was crossing the road. He run in front of us crossing the road."
Elsie Dean testified that she was seated on the driver's side of the Trailways bus about "middle ways of the bus," and that she saw Deason when he got off of the bus and "he stood there for awhile and then started walking fast across the street and the truck came around from the back of the bus and I knew there was going to be an accident and I closed my eye, you know, and I heard the brakes slamming on, and then I heard a loud thud and looked out there and saw the man coming back down on the hood of the truck." She further stated that she didn't think Deason "looked around any. I don't remember him looking around, and he couldn't see behind him anyway." She was also positive that the Kent truck which struck Deason was traveling in the same lane as the Greyhound bus and came directly from behind this bus and "he swerved around to pass."
Using a speed of 25 miles an hour for the Kent truck, at the time its driver saw Mr. Deason the first time it is shown by the Lawyers' Motor Vehicle Speed Chart that the truck would have traveled 50.1 feet after the brakes were applied and that the total braking distance would have been 86.8 feet. Of course, we realize that these charts are merely a guide and depend on other factors for accuracy such as condition of the brakes, etc. However, this estimate checks with the actual overall distance of the skid marks made by the Kent truck of 52 feet. In other words, this truck must have been approximately 59 or 60 feet from the point of the impact or collision when the driver first saw Deason. Had Deason looked he could have seen this truck. There is not one line of testimony that Deason ever looked to the left for traffic, but, on the contrary, without looking ran or walked very fast out into this busy highway. He not only did not exercise ordinary care but was guilty of gross negligence which was the proximate cause of his injury and death.
For the above and foregoing reasons the judgment of the district court is reversed, annulled and set aside and judgment is hereby rendered dismissing the suit of the plaintiffs at their costs.
NOTES
[1] One of the most highly respected Courts in the United States. At the time of this decision its Chief Justice was Alfred T. Vanderbilt, generally recognized as one of the foremost jurists in America.